**Nos. 23-3087, 23-3144**

IN THE

# United States Court of Appeals

## FOR THE SIXTH CIRCUIT

———————— ◆ ————————

ENDLESS RIVER TECHNOLOGIES LLC,

*Plaintiff-Appellant and Cross-Appellee,*

— v. —

TRANSUNION LLC,

*Defendant-Appellee and Cross-Appellant.*

———————————————

*On Appeal from the United States District Court for the Northern District of Ohio, Hon. Donald C. Nugent, District Judge, Civil Action No. 1:18-cv-00936-DCN*

**THIRD BRIEF ON APPEAL BY APPELLANT AND CROSS-APPELLEE ENDLESS RIVER TECHNOLOGIES LLC**

Stephen J. Rosenfeld
MCDONALD HOPKINS LLC
300 North LaSalle, Suite 1400
Chicago IL 60654
(312) 280-0111
srosenfeld@mcdonaldhopkins.com

Derek L. Shaffer
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
1300 I Street NW, 9th Floor
Washington, D.C. 20005
(202) 538-8000
derekshaffer@quinnemanuel.com

*Attorneys for Plaintiff-Appellant and Cross-Appellee Endless River Technologies, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................... iv

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 1

ARGUMENT ............................................................................................. 4

I.  TransUnion Ignores Endless River's Evidence Along With The
    Applicable Standard Of Review ....................................................... 4

II. TransUnion Does Not Dispute That The Agreement Allowed For
    Diminution-In-Value Damages, Which Here Equates To The Total
    Value Of the Source Code ............................................................... 8

    A.  The Jury Heard, And Endless River Argued For, A Diminution-
        In-Value Damages Theory ......................................................... 9

    B.  The Jury Had An Evidentiary Basis For Rejecting
        TransUnion's Criticisms Of Endless River's Damages Theory ........ 17

III. TransUnion Fails To Defend The District Court's "Lost Profits"
     Ruling .......................................................................................... 21

    A.  TransUnion Does Not Dispute That Endless River's Damages
        Were Directly Contemplated By The Agreement .......................... 22

    B.  TransUnion Does Not Show That Lost Profits Are
        Consequential Merely Because There Are Other "Links In The
        Causal Chain" ......................................................................... 28

IV. TransUnion Lacks Any Viable Alternative Grounds For Affirmance ........ 30

    A.  The Jury Award Is Not Barred By The "New-Business Rule" .......... 30

    B.  The Jury Award Is Based On The Correct Breach Date ................... 32

    C.  The Jury Award Excludes Prejudgment Interest .......................... 33

    D.  The Jury Award Is Supported By The Evidence ........................... 35

    E.  The Jury Properly Rejected TransUnion's Mitigation Defense ........ 38

CROSS-APPEAL ..................................................................................... 40

I.  This Court Should Affirm The District Court's Denial Of
    TransUnion's Motion For Summary Judgment And Grant Of Endless
    River's Motion For Partial Summary Judgment ................................. 40

A.    Neither Section 8.2 Nor The "New-Business Rule" Foreclosed Endless River's Damages As A Matter Of Law ..................................41

B.    The Agreement's Plain Language Refutes Transunion's Implausible And Unreasonable Interpretation .....................................42

II.    This Court Should Affirm The District Court's Denial Of TransUnion's Motion To Exclude Dr. Malec ................................47

A.    Dr. Malec's Expert Opinions Were Relevant .....................................48

B.    Dr. Malec's Expert Opinions Were Reliable .....................................49

III.    This Court Should Affirm The District Court's Denial Of TransUnion's Motions In Limine To Exclude Dr. Malec...........................53

CONCLUSION ...........................................................................55

CERTIFICATE OF COMPLIANCE ......................................................57

CERTIFICATE OF SERVICE...............................................................58

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ..............59

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abellan v. Lavelo Prop. Mgmt., LLC,*
 948 F.3d 820 (7th Cir. 2020)....................................................................28

*Aculocity, LLC v. Force Mktg. Holdings, LLC,*
 2019 WL 764040 (N.D. Ill. Feb. 21, 2019)..............................................24

*Air Safety, Inc. v. Teachers Realty Corp.,*
 706 N.E.2d 882 (Ill. 1999) ......................................................................47

*Airlink Commc'ns, Inc. v. Owl Wireless, LLC,*
 2011 WL 4376123 (N.D. Ohio Sept. 20, 2011) ..................................28, 30

*Am Equip. Co., v. Mitsubishi Caterpillar Forklift Am., Inc.,*
 152 F.3d 658 (7th Cir. 1998)....................................................................37

*Atl. City Assocs., LLC, v. Carter & Burgess Consultants, Inc.,*
 453 F. App'x 174 (3d Cir. 2011)..............................................................30

*Atlantech Inc. v. Am. Panel Corp.,*
 743 F.3d 287 (1st Cir. 2014) ....................................................................30

*Balsley v. LFP, Inc.,*
 691 F.3d 747 (6th Cir. 2012)....................................................................37

*Bavlsik v. Gen. Motors, LLC,*
 870 F.3d 800 (8th Cir. 2017)....................................................................36

*Beerman v. Graff,*
 621 N.E.2d 173 (Ill. App. 1993) ..............................................................25

*Black-Hosang v. Mendenhall,*
 2005 WL 3299070 (S.D. Ohio Dec. 5, 2005) ..........................................35

*Branham v. Thomas M. Cooley Law Sch.,*
 689 F.3d 558 (6th Cir. 2012)....................................................................53

*Bridgeport Music, Inc. v. Justin Combs Pub.,*
 507 F.3d 470 (6th Cir. 2007)....................................................................35

*In re Brown*,
    342 F.3d 620 (6th Cir. 2003) ................................................. 36

*Coffey v. DSW Shoe Warehouse, Inc.*,
    145 F. Supp. 3d 771 (N.D. Ill. 2015) ................................. 39

*Cox v. Shelby State Cmty. College*,
    194 F. App'x 267 (6th Cir. 2006) ......................... 4, 17, 18

*CSX Transp., Inc. v. Hensley*,
    556 U.S. 838 (2009) ............................................................ 36

*Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    906 F.2d 1206 (8th Cir. 1990) .......................................... 35

*In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods.
Liab. Litig.*,
    2020 WL 8707603 (S.D. Ohio Apr. 16, 2020) ................. 54

*Doherty v. City of Maryville*,
    431 F. App'x 381 (6th Cir. 2011) ..................................... 30

*Doornbos Heating & Air Conditioning, Inc. v. James D. Schlenker,
M.D., S.C.*,
    932 N.E.2d 1073 (Ill. App. 2010) ............................... 26, 27

*Dunn v. CCH Inc.*,
    834 F. Supp. 2d 657 (E.D. Mich. 2011) ........................... 32

*In re E.I. du Pont de Nemours and Co. C-8 Personal Injury Litig.*,
    348 F. Supp. 3d 650 (S.D. Ohio 2016) ............................. 54

*E.J. Brooks Co. v. Cambridge Sec. Seals*,
    105 N.E.3d 301 (N.Y. 2018) .............................................. 17

*Est. of Barnwell v. Grigsby*,
    801 F. App'x 354 (6th Cir. 2020) ..................................... 36

*Exelon Bus. Servs. Co., v. Pelco Structural, LLC*,
    2020 WL 7027565 (N.D. Ill. Nov. 30, 2020) ................... 38

*Fabiano v. City of Palos Hills*,
    784 N.E.2d 258 (Ill. App. 2002) ....................................... 42

*In re FCA US LLC Monostable Elec. Gearshift Litig.*,
    2022 WL 944285 (E.D. Mich. Mar. 29, 2022) ................................................52

*GeoMetWatch Corp. v. Behunin*,
    38 F.4th 1183 (10th Cir. 2022)...........................................................................16

*Glen Hollow Partnership v. Wal-Mart Stores, Inc.*,
    1998 WL 84144 (7th Cir. 1998) .........................................................................32

*Griffith v. Franklin Cnty., Kentucky*,
    975 F.3d 554 (6th Cir. 2020)...............................................................................41

*Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*,
    974 F.3d 767 (6th Cir. 2020)...............................................................................30

*Hardyman v. Norfolk & Wester Ry. Co.*,
    243 F.3d 255 (6th Cir. 2001)...............................................................................47

*Heaver v. Ward*,
    386 N.E.2d 134 (Ill. App. Ct. 1979)..............................................................33, 35

*Ivey v. Transunion Rental Screening Sols., Inc.*,
    --- N.E.3d ---, 2022 WL 17245179 (Ill. 2022) .............................................31, 32

*Jeffries v. Wal-Mart Stores, Inc.*,
    15 F. App'x 252 (6th Cir. 2001) .........................................................................37

*Johnson v. Nat'l Sea Prod., Ltd.*,
    35 F.3d 626 (1st Cir. 1994) .................................................................................38

*M.S. Distrib. Co. v. Web Records, Inc.*,
    2003 WL 21087961 (N.D. Ill. May 13, 2003) ...................................................32

*In re Magnesium Corp. of Am.*,
    682 F. App'x 24 (2d Cir. 2017)...........................................................................36

*Maiz v. Virani*,
    253 F.3d 641 (11th Cir. 2001).............................................................................34

*Mayster v. Santacruz*,
    163 N.E.3d 246 (Ill. App. Ct. 2020)...................................................................39

*Mead Corp. v. McNally-Pittsburg Manufacturing Corp.*,
654 F.2d 1197 (6th Cir. 1981)................................................................29

*Meriturn Partners, LLC v. Banner & Witcoff, Ltd.*,
31 N.E.3d 451 (Ill. App. 2015) ............................................................32

*Midland Hotel Corp. v. Reuben H. Donnelley Corp.*,
515 N.E.2d 61 (Ill. 1987) ...................................22, 23, 24, 25, 28, 29

*Milex Prods., Inc. v. Alra Labs, Inc.*,
603 N.E. 2d 1226 (Ill. App. 1992) ..................................................32, 49

*Mosby-Meachem v. Memphis Light, Gas & Water Div.*,
883 F.3d 595 (6th Cir. 2018)..................................................................1

*Ner Tamid Congregation of N. Town v. Krivoruchko*,
638 F. Supp. 2d 913 (N.D. Ill. 2009) ...................................................38

*Ok Yeon Yoon v. K-Ltd. Carrier, Ltd*.,
2020 WL 1031486 (N.D. Ohio Mar. 3, 2020) ...................................52

*Penncro Associates Inc. v. Sprint Spectrum, L.P.*,
499 F.3d 1151 (10th Cir. 2007)........................................................29, 30

*Porter v. AAR Aircraft Servs., Inc.*,
790 F. App'x 708 (6th Cir. 2019) .........................................................54

*Powell Elec. Sys., Inc. v. Hewlett Packard Co.*,
356 S.W.3d 113 (Tex. App. 2011) .....................................................3, 28

*Pratt v. Petelin*,
733 F.3d 1006 (10th Cir. 2013)..............................................................34

*Primoff v. Warfield*,
495 F. App'x 293 (4th Cir. 2012) .........................................................29

*R.R. Donnelley & Sons Co. v. Vanguard Transp. Sys., Inc.*,
641 F. Supp. 2d 707 (N.D. Ill. 2009) ....................................................40

*Reid Hospital & Health Care Servs., Inc. v. Conifer Revenue Cycle
Sols., LLC*,
8 F.4th 642 (7th Cir. 2021)...................................................................29

*Roach v. Hughes*,
2015 WL 3970739 (W.D. Ky. June 30, 2015) ...................................................55

*Rose v. Truck Ctrs., Inc.*,
388 F. App'x 528 (6th Cir. 2010) ........................................................................52

*Royal Ins. Co. v. Orient Overseas Container Line Ltd.*,
514 F.3d 621 (6th Cir. 2008) ...............................................................................41

*In re Scrap Metal Antitrust Litig.*,
527 F.3d at 528 ..............................................................................................47, 49

*Sheffield v. Int'l Paper Co.*,
2020 WL 1882906 (W.D. Tenn. Feb. 26, 2020) .................................................52

*Shinseki v. Sanders*,
556 U.S. 396 (2009) ............................................................................................55

*Smith & Nephew, Inc. v. Arthrex, Inc.*,
355 F. App'x 384 (Fed. Cir. 2009) ......................................................................12

*SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*,
841 F.3d 827 (10th Cir. 2016) .............................................................................23

*Somotext Corp. v. Zoove, Inc.*,
2020 WL 533006 (N.D. Cal. Feb. 3, 2020) .........................................................52

*Stuart Park Assocs. Ltd. v. Ameritech Pension Tr.*,
51 F.3d 1319 (7th Cir. 1995) ...............................................................................32

*Supervalu, Inc. v. Associated Grocers, Inc.*,
2007 WL 624342 (D. Minn. Jan. 3, 2007) ..........................................................50

*Sys. Dev. Integration, LLC v. Computer Scis. Corp.*,
886 F. Supp. 2d 873 (N.D. Ill. 2012) ..................................................................35

*T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*,
592 F.3d 329 (2d Cir. 2010) ..................................................................................9

*TAS Distrib. Co. v. Cummins Engine Co.*,
491 F.3d 625 (7th Cir. 2007) ...............................................................................31

*Tate & Lyle Americas LLC v. Glatt Air Techniques, Inc.*,
  2016 WL 7422289 (C.D. Ill. May 20, 2016) ....................................22

*Thompson v. Doane Pet Care Co.*,
  470 F.3d 1201 (6th Cir. 2006)...........................................................54

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
  487 F.3d 89 (2d Cir. 2007)................................................................30

*Tri-G, Inv. v. Burke, Bosselman & Weaver*,
  856 N.E.2d 389 (Ill. 2006) ...............................................................31

*U.S. Diamond & Gold v. Julias Klein Diamonds LLC*,
  2008 WL 4116090 (S.D. Ohio Aug. 28, 2008)..................................54

*United States v. Mallory*,
  902 F.3d 584 (6th Cir. 2018).............................................................49

*United States v. Renfro*,
  600 F.2d 55 (6th Cir. 1979)...............................................................38

*United States v. Roberts*,
  830 F. Supp. 2d 372 (M.D. Tenn. 2011) ...........................................54

*Vanderhoef v. Dixon*,
  938 F.3d 271 (6th Cir. 2019).............................................................15

*Westlake Fin. Grp., Inc. v. CDH-Delnor Health Sys.*,
  25 N.E.3d 1166 (Ill. App. Ct. 2015)..................................................29

*White v. Burlington N. & Santa Fe R.Co.*,
  364 F.3d 789 (6th Cir. 2004).............................................................33

*Wolfensberger v. Eastwood*,
  889 N.E.2d 635 (Ill. App. 2008) .......................................................44

**Rules**

Fed. R. Civ. P. 49(a)..............................................................................33

Fed. R. Civ. P. 50 .................................4, 7, 10, 12, 15, 20, 27, 30, 33, 37

Fed. R. Civ. P. 50(a)..............................................9, 13, 30, 31, 33, 42

Fed. R. Civ. P. 50(b) ................................................................15

Fed. R. Civ. P. 56 ...................................................................4

Fed. R.Civ. P. 56(a) ..............................................................41

Fed. R. Evid. 702 ..................................................................48

**Other Authorities**

24 Williston on Contracts § 64:16 (4th ed.) ..........................23

75B Am. Jur. 2d Trial § 1541 .................................................36

## INTRODUCTION AND SUMMARY OF ARGUMENT

In responding to the appeal, TransUnion ignores the applicable standard of review.  It repeatedly argues that Endless River's damages theory was factually flawed, contrary to what the jury reasonably found.  But, once the jury found for Endless River, the district court (1) was required to view the evidence in the light most favorable to Endless River; (2) was prohibited from weighing the evidence, evaluating witness credibility, and supplanting the jury's views; and (3) could set aside the verdict only if no reasonable jury could find against TransUnion.  *E.g.*, *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 602 (6th Cir. 2018).  And the jury heard overwhelming evidence that TransUnion misappropriated Endless River's source code in flagrant breach of a contract, sabotaged Endless River's efforts to start a successful business, and returned the source code on the eve of trial only for the sake of optics, after the code had become worthless.  Per what TransUnion told the jury, the damages case came down to "credibility," Tr.Vol.5, R.268, PageID#14273—and the jury credited Endless River's witnesses and case, to the tune of awarding $18.3 million in damages.

The district court's sole purported basis for overturning the jury's award was simply that, as a matter of law, Endless River's operative damages theory was foreclosed by the parties' Agreement, as construed by the court.  That is all.  None of the jury's underlying findings was deemed suspect.  And both the district court

and TransUnion accept that the jury's award would *stand* if the jury heard evidence that TransUnion's breach directly eviscerated the source code's *value*. That is, in fact, precisely what the evidence showed and what the jury found. Endless River's expert, Dr. Andrew Malec, testified that his methodology valued the source code as of April 2018, the date of the breach, and Endless River's principals testified that the source code lost all value between then and 2022, when TransUnion returned the code. In sum, this award reflects what the jury reasonably found to be *diminution in value*—a measure of damages that is irreproachable by any fair account.

This damages theory is as direct as could be, yet the district court misapprehended it. To rationalize the district court's error, TransUnion now claims that Endless River characterized its damages below as lost profits. But the record refutes that. Dr. Malec expressly testified that he was *not* offering a lost profits measure of damages, while TransUnion below repeatedly (and correctly) characterized Endless River's damages theory as claiming the lost *value* of the Quote Exchange. That leaves only TransUnion's methodological criticisms of how Endless River measured lost value. But such criticisms at most go to Dr. Malec's credibility (not the directness of Endless River's damages theory) and whistle past testimony by Endless River's witnesses—testimony that the jury had ample reason to credit.

2

Even if TransUnion were correct that Endless River's damages theory equated to lost profits, however, this Court should *still* reverse because those damages, for this breach, *still* qualify as direct under the Agreement's express terms. TransUnion does not dispute that the court should have focused on the animating purpose of the specific provision TransUnion breached (requiring return of the source code), which was to enable Endless River to commercialize the source code and obtain future business. That verdict restored Endless River to the position it would have occupied had TransUnion complied with this provision. By setting aside the verdict, the district court betrayed the parties' bargain, as reflected in the express, agreed terms.

Nor does TransUnion deny that the central case the district court relied upon, *Powell Electrical Systems, Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113 (Tex. App. 2011), supports Endless River. Without mentioning *Powell*, TransUnion argues as though that the Agreement barred Endless River from recovering *all* lost profits and revenues, *regardless* of whether they constitute direct damage from the specific breach at issue. *See, e.g.*, 2nd.Br.1 (referring, without qualification, to "the bar on 'LOST PROFITS OR REVENUE'"). But no authority so holds or suggests. Moreover, the novel rule adopted below threatens to vitiate bargained-for obligations and to invite costless breaches by parties, like TransUnion, that claim they can do their worst while paying nothing more than pennies for doing so, on the

theory that the most natural, predictable damages are nonetheless foreclosed as "consequential." 1st.Br.45-46.

Presumably recognizing the vulnerability of the district court's analysis, TransUnion devotes much of its brief to positing five alternative grounds for affirmance. But each alternative ground amounts to an improper attack on the jury verdict, resting on contentions that were rejected by the jury and/or waived by TransUnion. Nor is there merit to TransUnion's cross-appeal, which takes a kitchen-sink approach while largely attacking Dr. Malec's credibility, only under the auspices of Rule 56, *Daubert*, and motions in limine. As for TransUnion's half-hearted argument that the district court should not have found that Endless River was entitled to the source code under the Agreement, it defies unambiguous, controlling language of the Agreement and flouts the parties' obvious intent.

This Court should reverse the ruling below, reject TransUnion's alternative grounds for affirmance and cross-appeal, and remand with instructions to reinstate the jury's award.

## ARGUMENT

### I. TransUnion Ignores Endless River's Evidence Along With The Applicable Standard Of Review

TransUnion does not dispute that, on a Rule 50 motion, a court must draw all reasonable inferences in favor of the nonmoving party and "disregard all evidence favorable to" the moving party. *Cox v. Shelby State Cmty. College*, 194 F. App'x

267, 274 (6th Cir. 2006) (per curiam) (citation omitted); *see* 1st.Br.27-28. The case Endless River made to the jury was straightforward and well substantiated: the Quote Exchange was a groundbreaking idea, pioneered by two proven entrepreneurs in the insurance industry, that furnished a recipe for success until TransUnion refused to turn over the essential code and sabotaged Endless River's relationship with other would-be partners. TransUnion's Statement of the Case (2nd.Br.5-23) contests all of this, but does so in total disregard of the relevant standard of review and evidence that the jury was entitled to credit.

To start, the Quote Exchange was a successful product freighted with potential and value, not a "failure[]," as TransUnion calls it (2nd.Br.5). Endless River's principals, Rich Bonitz and Phil Wintering, were successful entrepreneurs who previously founded Insurance.com, the first online comparative rating agency for insurance policies, and built it up into a billion-dollar company. Tr.Vol.1, R.262, PageID#12917, 12927. Both were positioned to chart similar success with the Quote Exchange. *See id.* at 12919 ("Phil [Wintering] is one of those big thinkers who has a Rolodex like you wouldn't believe. He knows everybody in the insurance industry ...."); Tr.Vol.3, R.266, PageID#13728.

Before partnering with TransUnion, Endless River's principals had met with the nation's largest insurance carriers, who were "excited" to join forces. Tr.Vol.2, R.264, PageID#13292; *see id.* at 13296 (testifying that the "whales" of the insurance

5

industry "were interested in the Quote Exchange"). Endless River partnered with TransUnion not—as TransUnion implies (2nd.Br.5)—because its strategy was failing, but because partnership with a credit bureau would enhance the Quote Exchange by enabling insurance carriers to access customer data. Tr.Vol.1, R.262, PageID#12948. Other data providers were interested in partnering with Endless River before it signed with TransUnion. *See id.*; Tr.Vol.3, R.266, PageID#13740 (describing discussions with a different data provider, Axiom). Far from being mere "educated guesswork" (2nd.Br.7; citation omitted), Endless River's projections from this period were based on data from insurance carriers and Messrs. Bonitz and Wintering's "expertise"; TransUnion never questioned the accuracy of these models until years later. Tr.Vol.1, R.262, PageID#12951-53; *see id.* at 12966, 12968.

So why did the Endless River–TransUnion partnership fail? Because TransUnion never held up its part of the bargain—not, as TransUnion suggests (2nd.Br.8-10), because the Quote Exchange was defective. TransUnion failed to contract with any of the interested insurance carriers, and TransUnion's delays caused carriers to drop out. Tr.Vol.1, R.262, PageID#12984-86. TransUnion's development process for the Quote Exchange was also serially delayed, crippling the project's all-important momentum. Tr.Vol.3, R.266, PageID#13763.

Even so, the Quote Exchange retained its value when TransUnion terminated the Agreement (which is why TransUnion hoarded it), and TransUnion's breach and

6

interference sabotaged the Quote Exchange.  Because the market "opportunity" persisted when TransUnion terminated the Agreement in April 2018, Tr.Vol.1, R.262, PageID#12954, Endless River was "delighted" by the termination, which freed Endless River to pursue this market without TransUnion's obstruction. Tr.Vol.3, R.266, PageID#13770.  And Endless River engaged with two companies, LeadCloud and ITC, about partnering.  *Id.* at 13784-85.  But no company would partner with Endless River—even if it rebuilt the code that TransUnion was withholding—because TransUnion "told everybody that ... they owned the Quote Exchange ... and the IP," effectively deterring would-be partners.  Tr.Vol.2, R.264, 13264-66.

Finally, the Quote Exchange lost all value by the time TransUnion returned it. From 2018 through 2020, other companies started to bring to market similar products, the Quote Exchange lost its "first mover advantage," and, as of 2022, the product had become "worthless."  *Id.* at 13268-70.

All of the above was reflected in trial evidence and testimony that the jury was entitled to credit, as it did in rendering a verdict for Endless River.  By arguing otherwise, TransUnion is defying the verdict, the evidence, and the standard of review for all issues surrounding post-verdict relief under Rule 50, including the ruling from which Endless River appeals.

## II.     TransUnion Does Not Dispute That The Agreement Allowed For Diminution-In-Value Damages, Which Here Equates To The Total Value Of the Source Code

No legal defect infects the jury's verdict.  TransUnion does not deny that the jury could award Endless River direct damages equal to the loss in value of the source code, per the Agreement.  Nor does TransUnion deny that it was reasonable for the jury to find that the diminution in value here equates with the *total* value of the source code, because "Endless River lost all of that value, which had fallen to zero four years later," when TransUnion finally returned it.  1st.Br.34.  Notably, TransUnion scarcely defends the district court's misconception that such diminution-in-value damages must be limited to "a portion of the value of the source code itself," Mem.Op., R.288, PageID#14634, which, as Endless River has demonstrated, overlooks proof at trial that "the window ha[d] closed" on monetizing the Quote Exchange; the Quote Exchange "is worth nothing now, so that is the diminution claim."    Tr.Vol.4, R.267, PageID#14065; *see* Tr.Vol.2, R.264, PageID#13270; 1st.Br.12-17, 37.  In sum, there is no difference between *valuing* the source code and quantifying the *diminution* in value:  the two numbers are the same, because TransUnion's breach cost Endless River the total value of the source code.

While virtually conceding this point, TransUnion abandons the indefensible theory it offered below (and the district court did not adopt), according to which any valuation method that incorporates lost profits should be verboten for that reason

8

alone. *See* 1st.Br.34-35 (collecting authorities rejecting this argument). To reiterate, "a contractual exclusion of consequential damages 'does not foreclose liability for lost profits to the extent those profits merely reflect the value of the goods at destination.'" *T.Co Metals, LLC v. Dempsey Pipe & Supply, Inc.*, 592 F.3d 329, 340 (2d Cir. 2010) (citation omitted) (cited in 2nd.Br.34-35). So too here: Section 8.2's exclusion of *consequential* damages (as distinct from *direct* damages) *preserves* Endless River's right to recover lost profits and lost revenue provided those amounts reflect the value of the wrongfully-withheld source code.

Unable to deny that lost value can properly qualify as direct damage in cases like this, TransUnion focuses on contending, wrongly, that Endless River never purported to be seeking diminution-in-value damages below and, incoherently, that Endless River used a flawed methodology to measure diminution in value. But the record refutes TransUnion in both respects.

## A. The Jury Heard, And Endless River Argued For, A Diminution-In-Value Damages Theory

Contrary to TransUnion's account (2nd.Br.26), Endless River "waived" nothing below, for it repeatedly characterized its damages theory as one for diminution in value. When TransUnion moved for judgment under Rule 50(a), Endless River responded that "the only damages we're seeking are direct damages here, and the actual damages that we're seeking, which are allowed under the contract, is a diminution of value in the Quote Exchange." Tr.Vol.4, R.267,

PageID#14064.  Endless River further explained that its theory of damages was one for "diminution" in value because Dr. Malec testified he valued the source code "as of that date of breach" and Endless River presented evidence that the source code was "worth nothing now." *Id.* at 14064-65.  Although TransUnion blankly suggests that page 14064 of the transcript supports its waiver argument (2nd.Br.28), reading it confirms the opposite.

Then, in post-trial briefing, it was common ground between the parties that Dr. Malec's damages figure represented the Quote Exchange's diminution in value. As TransUnion put it, Dr. Malec "purported to apply the 'Venture Capital approach'—*a valuation method* used 'by economists *to value start-up companies*'— *to determine the value of the Quote Exchange*."  Mem., R.277, PageID#14440 (emphases added).  Endless River agreed:  "Dr. Malec testified 20 times that he *valued the Quote Exchange* as of April 2018."  Opp., R.283, PageID#14562 (emphasis added).  Nor are these a mere "handful of references," as TransUnion now claims (2nd.Br.28 n.2).  In its Rule 50 motion, TransUnion used the word "value" (or some variant) 41 times and repeatedly described Dr. Malec's methodology as arriving at "an estimated value for the Quote Exchange" at each step of his methodology.  Mem., R.277, PageID#14442.[1]

---

[1]    *See id.* at 14440 ("Malec Adopts A Counterfactual World To Value The Quote Exchange"); *id.* at 14441 ("This further inflated his estimate of the Quote

Not only did TransUnion characterize Dr. Malec as calculating the value of the Quote Exchange, but it affirmatively relied on that characterization. In particular, TransUnion invoked Illinois' new-business rule because Dr. Malec had "purported to value the Quote Exchange as a 'start-up company.'" Mem., R.277, PageID#14455 (emphasis removed); *see infra*, Part IV.A. Likewise, TransUnion asserted that Dr. Malec "value[d] the Quote [E]xchange on … March 31, 2014" and "September 12, 2022" to complain that Dr. Malec's damages figure failed to measure the value of the source code when TransUnion breached the contract. Mem., R.277, PageID#14456-57; *see infra*, Part IV.B. And TransUnion criticized Dr. "Malec's decision to apply a 'growth rate' *to value a business* as of the date of trial" to purportedly show that Dr. Malec's valuation included prejudgment interest. Reply, R.285, PageID#14589 (emphasis added); *see infra*, Part IV.C.

---

Exchange's value…. From there, Malec discounted the total by 70% 'to determine the value of the QE Program ….'"); *id.* at 14442 ("This resulted in an estimated value for the Quote Exchange of $18.9 million …."); *id.* ("Malec next purported to adjust his calculation to 'recogniz[e] the value of an asset will change over time ….'"); *id.* at 14443 ("Under Malec's made-up methodology, the value calculated for the Quote Exchange 'grew' …."); *id.* at 14445 (describing motion to exclude Dr. Malec's "opinion about the value of the Quote Exchange as of the date of termination in April 2018"); *id.* at 14446 (Dr. "Malec admitted that he estimated the 'value of the QE Program as of March 31, 2014' and then 'grossed-up the value of the QE Program …. to arrive at an estimated value of the QE Program.'"); *id.* at 14449 ("TransUnion repeatedly objected to Malec's attempt … to recast his existing calculation as purporting to value the Quote Exchange as of April 2018.").

11

TransUnion maintains (2nd.Br.28) that, "[i]n its post-trial briefing, Endless River reasserted that '[b]ecause Endless River's damages are direct lost profits, they are not barred by Section 8.2'" (quoting Opp., R.283, PageID#14552), but, read in proper context, "lost profits" here was a short-hand way of referencing the first step in Dr. Malec's analysis, which is what TransUnion had attacked as legally disqualifying. In its Rule 50 motion, TransUnion repeatedly acknowledged that Dr. Malec had testified to the Quote Exchange's "value," not lost profits. *Supra*, page 10 & n.1. TransUnion then argued that the "'first step' in Dr. Malec's analysis was 'to determine expected revenue,'" and that his valuation measure was improper because it incorporated "consequential lost profits" as a central variable. Mem., R.277, PageID#14452-53. Because the portion of Endless River's brief that TransUnion cites was made "within the confines" of responding to TransUnion's argument, it is not evidence of waiver. *Smith & Nephew, Inc. v. Arthrex, Inc.*, 355 F. App'x 384, 386 n.2 (Fed. Cir. 2009) (per curiam) (rejecting claim that "post-trial argument" was waived because the passage in question was "taken out of context").

To be clear, Endless River was arguing only that its "damages are direct"; it was not maintaining that they reflected lost profits, different from lost value, because the parties expressly agreed throughout their briefs that its damages fell under the latter heading, while disputing whether mere consideration of lost profits should itself be disqualifying. Opp., R.283, PageID#14536. Indeed, Endless River earlier

12

in its opposition brief walked through how Dr. Malec "Calculates Damages Using the Most Commonly Used Method to Value Early Stage Companies," *id.* at 14547-49, before refuting TransUnion's arguments regarding Dr. Malec's consideration of lost profits at the first step, *id.* at 14552-54.  The district court then adopted the anomalous misconception—contrary to Dr. Malec's testimony and the parties' agreement—that Endless River's damages theory never tried to capture "the value of the source code itself" and that "Endless River did not attempt to define that value and did not seek that value as damages."  Mem.Op., R.288, PageID#14634.

The record likewise shows, contrary to TransUnion's assertion (2nd.Br.28 n.2), that Endless River "presented [a diminution-in-value theory] to the jury," furnishing sufficient evidence to sustain the verdict.  *See* Fed. R. Civ. P. 50(a).  Dr. Malec testified that he was tasked with "determin[ing] *the value of the Quote Exchange* had the Quote Exchange been given to Endless River at the date of termination on April 2nd of 2018," not the lost profits Endless River would have earned.  Tr.Vol.4, R.267, PageID#13955 (emphasis added).  When asked his opinion of the "the value of the Quote Exchange if it would have been turned over to Endless River on April 2nd, 2018," Dr. Malec responded:  "I determined the value to be $55.2 million."  *Id.* at 13956-57.  He then explained that he employed the "venture capital approach" for "valuing the Quote Exchange," which is "the most common generally-accepted valuation method that's used by economists to value early-stage

companies." *Id.* at 13956.  Even TransUnion ultimately admits that "Endless River candidly told jurors at the outset of trial[] [that] Endless River sought '*the value* of our start-up' as damages," not lost profits.  2nd.Br.30 (quoting Voire Dire Tr., R.261, PageID#12792) (emphasis added).

Indeed, Dr. Malec's venture-capital model for valuing the source code *cannot* be a lost-profits model.  Dr. Malec never considered the costs that Endless River would incur as a company, even though costs are one of two determinants of profits.  Moreover, Endless River's expected revenues—the second determinant of profits—were merely one variable in Dr. Malec's model, not the output.  Dr. Malec multiplied Endless River's expected revenues by the "valuation multiple[]" (enterprise value divided by total revenue) for companies similar to Endless River in order to determine Endless River's expected enterprise value.    Tr.Vol.4, R.267, PageID#13960-62.  Dr. Malec then reduced this sum by a 70% discount, to account for the "risks" that Endless River's value would be lower.  *Id.* at 13962-63.  Finally, Dr. Malec multiplied the value of the Quote Exchange to account for the growth it would have experienced until the breach.  *See id.* at 13963.  All told, only the first of Dr. Malec's steps has anything to do with profits or revenue.

| **Dr. Malec's Valuation Methodology:** |
|:---:|
| (ER Revenue) × (Valuation Multiple) × (70% Discount) × (Growth Multiplier) |

For the avoidance of doubt, Dr. Malec testified that his valuation method did *not* measure the money Endless River would have earned. Dr. Malec contrasted his venture capital methodology with "the discounted cash flow method," which purely captures profits or revenues by "valu[ing] a company by projecting cash flows over a period of time." *Id.* at 13958. Dr. Malec rejected a "discounted cash flow method" as improper because "a start-up often has significant value before it even has any cash flows whatsoever." *Id.* at 13957-58. It was irrelevant that Endless River did not make profits (*see, e.g.*, 2nd.Br.9), because "[s]tart-up companies typically have little or no revenues, negative earnings, negative cash flow." Tr.Vol.4, R.267, PageID#13958.

Nor does TransUnion accomplish anything by citing the complaint, summary judgment and *Daubert* briefing, all of which are afield from the trial record and verdict. Rule 50(b) turns exclusively on the Rule 50 arguments and the "evidence in the trial record," not prior pleadings and briefs that the jury never saw. *Vanderhoef v. Dixon*, 938 F.3d 271, 275 (6th Cir. 2019). All TransUnion establishes is that Endless River at earlier stages preserved an option potentially to seek lost profits, alongside several other damages categories, including "compensatory damages," such as diminution in value. Opp., R.95, PageID#1942; *see* 2nd.Am.Compl., R.113, PageID#2685. Endless River's *Daubert* opposition used the phrase "lost profits" to rebut TransUnion's arguments that Dr. Malec could not

"'use [] speculative, inaccurate or false projections of income *in the valuation of a business.*'"  Mem., R.180, PageID#9824 (emphasis added; citation omitted).
Finally, when opposing TransUnion's motion in limine, Endless River made clear that "[w]e're seeking direct damages in this case for the value" of the Quote Exchange.  Tr.Vol.1, R.262, PageID#12993.  Only after the court countered "[t]hose are lost profits" did Endless River respond, as a fallback, "[w]e're seeking direct lost profits." *Id.* at 12994.

This case bears no resemblance to *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183 (10th Cir. 2022) (cited in 2nd.Br.28-29), where the plaintiff "acknowledged that [its lost business value] theory was neither presented to nor considered by the district court," and never mentioned "a lost business value theory." *Id.* at 1205-06.
Here, Dr. Malec expressly opined at trial on the lost value of the Quote Exchange while distinguishing and rejecting a pure analysis of lost profits or revenues, whereupon the parties together *agreed* that Dr. Malec was attesting to the source code's *value*.

By no means did Endless River waive its ability to challenge the district court's singular misconception, which broke even from the post-trial arguments advanced by TransUnion.  And TransUnion lacks any substantive defense of the district court's misconception—now debunked—that Endless River and Dr. Malec

had supposedly veered away from measuring lost valuation to isolate instead on lost profits.  *See* 1st.Br.30-39.

**B.    The Jury Had An Evidentiary Basis For Rejecting TransUnion's Criticisms Of Endless River's Damages Theory**

Given that Section 8.2 undisputedly permits a diminution-in-value theory of damages, the only question is whether sufficient evidence sustains the jury award of the diminution-in-value damages claimed by Endless River.  As to that, TransUnion denies (2nd.Br.29) that Dr. Malec's valuation actually "measure[s] diminution." Here, TransUnion merely quibbles with particulars of Dr. Malec's methodology, without calling into question what Dr. Malec purported to measure.  A court drawing all reasonable inferences in Endless River's favor, and "disregard[ing] all evidence favorable to [TransUnion]" could not properly set aside the jury verdict as failing to capture diminution in value.  *Cox*, 194 F. App'x at 274 (citation omitted).

TransUnion nonetheless claims (2nd.Br.30) that Dr. Malec measured "the value of the entire business," rather than "the limited, standalone value of the source code," but the point is misplaced in this context.  As Endless River explained and TransUnion ignores (1st.Br.35), intellectual property's value typically equals "the profits [a plaintiff] lost as a result of [the] defendant's conduct." *E.J. Brooks Co. v. Cambridge Sec. Seals*, 105 N.E.3d 301, 311 (N.Y. 2018) (citation omitted).  When Endless River references "intellectual property" and "the value of the entire business" (2nd.Br.30), therefore, it does so as short-hand for estimating the

17

intellectual property of a one-product company.  In all events, the district court owed "credence," *Cox*, 194 F. App'x at 275 (citation omitted), to Dr. Malec's explanation that he was offering a "conclusion about the value of the Quote Exchange if it would have been turned over to Endless River."  Tr.Vol.4, R.267, PageID#13956.

TransUnion also complains (2nd.Br.30) that the Quote Exchange's value needed to be further discounted based on the value of "other steps and inputs Endless River needed to run, launch and monetize the Quote Exchange platform post-termination."  As TransUnion later admits (2nd.Br.35-36), however, this reduces to a factual dispute about whether Endless River could successfully clear "several hurdles *before* it could ever … make a profit."  (emphasis in original).  And the jury had good evidentiary basis to find that, in fact, Endless River would have overcome those hurdles absent TransUnion's sabotage. *Supra*, pages 5-7; *see also Cox*, 194 F. App'x at 274.  Regardless, Dr. Malec *did* account for such risks, conservatively, by adopting his 70% uncertainty discount, which designedly took "into consideration the[se] risks … of [Endless River] [not] achieving" its projected value, Tr.Vol.4, R.267, PageID#13963, while also acknowledging that "a start-up [like Endless River] often has significant value before it even has any cash flows whatsoever," *id.* at 13957.  Further grounding this approach was testimony from Mr. Bonitz that he and Mr. Wintering had built an insurance company from nothing "to a billion dollar

book of business." Tr.Vol.1, R.262, PageID#12927; *supra*, pages 5-6. Contrary to its arguments here, TransUnion offered no meaningful rejoinder at trial.

TransUnion next contends (2nd.Br.32) that Dr. Malec "fail[ed] to demonstrate that the source code had any value as of April 2018, the date of termination," but that is not even an objection to Dr. Malec's *method*—at most, it is an objection to a single input, and an objection that failed to impress the jury. Regardless, Dr. Malec refuted it by testifying that his calculation of damages measured "the value of the Quote Exchange in April of 2018." Tr.Vol.4, R.267, PageID#14035; *see id.* at 14031 ("Q And you didn't do any damages calculation as of April 2018, did you? A That— that's—that's not correct. I performed economic damages and determined the value of the Quote Exchange in Endless River's hands at the date of termination, which was April of 2018."). This testimony, too, deserves credit.

Nor can TransUnion's remaining criticisms overcome contrary record evidence and findings. Dr. Malec testified, for example, that the fact that he used projections from 2013 in his methodology did not mean, as TransUnion now claims (2nd.Br.31-32), that he "estimated damages as of January 2013." Tr.Vol.4, R.267, PageID#13968. He used a 2013 projection because it "was the only projection that took into account the market opportunity of the Quote Exchange in Endless River's hands as the date of termination, April of 2018." *Id.* at 13967. Moreover, Dr. Malec determined, "to a reasonable degree of economic certainty," that these projections

19

"took into consideration the market opportunity of Quote Exchange in 2018." *Id.* at 13967-68. Messrs. Bonitz and Wintering correspondingly testified, based on their on-point experience, that the 2013 projection (1) was a realistic model of the market, not just "guesswork" (2nd.Br.7 (citation omitted)), (2) was accepted by TransUnion when they started working together, and (3) was not achieved in practice only because TransUnion failed to properly execute its side of the bargain by not finding proper corporate partners and delaying development. *Supra*, Part I.

Dr. Malec likewise denied, contrary to TransUnion's assertions (2nd.Br.31), that he "estimate[d] Endless River's enterprise value as of March 2014" (emphasis removed). That was the "the date" at which Dr. Malec "valued the projection," and then, as the final step in his analysis, Dr. Malec increased his estimate of the Quote Exchange value to account for "market performance" after 2014. Tr.Vol.4, R.267, PageID#14035-36. TransUnion objects (2nd.Br.32) to Dr. Malec growing the value of the Quote Exchange from 2014 through 2021 "at a rate ranging 'from 18 percent on average to 14 percent on average'" (quoting Tr.Vol.4, R.267, PageID#14036). But this speaks to the *accuracy* of Dr. Malec's calculations, not *what* he purported to calculate. And the district court was required, on a Rule 50 motion, to credit Dr. Malec's testimony that his growth rates tracked those of "comparable[]" companies. Tr.Vol.4, R.267, PageID#14038. In any event, the jury agreed in relevant part with

20

TransUnion by declining to credit the growth rate in arriving at its award, further confirming the jury's reasonableness. *See* 1st.Br.32 n.3; *infra*, page 36.

Finally, citing an (irrelevant) deposition transcript that never went to the jury, TransUnion criticizes (2nd.Br.32) Dr. Malec for not calculating whether the source code's value had diminished to zero when TransUnion returned the code a few weeks before trial. But that was beyond the scope of Dr. Malec's assignment, which was to value the Quote Exchange as of April 2018. It was Mr. Bonitz who testified that the Quote Exchange "was worthless" in 2022, and TransUnion makes no attempt to explain why the jury could not credit Mr. Bonitz's testimony. Tr.Vol.2, R.264, PageID#13270; *supra*, page 7.

In sum, the case was "about credibility," precisely as TransUnion told the jury. Tr.Vol.5, R.268, PageID#14273. And the jury properly credited testimony by Dr. Malec and Messrs. Bonitz and Wintering. TransUnion's post-trial attacks on these witnesses' credibility are misplaced; they afford no basis for affirming the erroneous decision below to jettison the jury's award as though it was contractually foreclosed.

## III.    TransUnion Fails To Defend The District Court's "Lost Profits" Ruling

Even if the district court were correct in characterizing Endless River's damages as lost profits (it was not), it still erred in characterizing these "profits" as consequential and not direct. Tellingly, TransUnion scarcely defends (2nd.Br.33-44) the district court's reasoning on its own terms.

### A.    TransUnion Does Not Dispute That Endless River's Damages Were Directly Contemplated By The Agreement

TransUnion ostensibly agrees (2nd.Br.37) that the key determinant of whether damages are direct rather than consequential, per *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515 N.E.2d 61, 67 (Ill. 1987), is whether "the very purpose" of the breached clause was to earn the profits at issue.  Nor does TransUnion deny that the district court erred by considering the Agreement's overall purpose in the abstract, rather than the specific purpose of the individual termination clause requiring return of the source code.  1st.Br.43-46.

TransUnion does not explain what purpose the termination clause could serve, other than to allow Endless River to commercialize the source code, as the express terms specify.  Like the Yellow Pages listing in *Midland*, "[t]he value of" the source code is just "a means towards attracting new customers and stimulating new growth and thereby increasing profits."  515 N.E.2d at 67.  Because lost business arising from the source code is "the only possible damage resulting from a breach" of the termination clause, that lost business is "utterly foreseeable and therefore direct damages."  *Tate & Lyle Americas LLC v. Glatt Air Techniques, Inc.*, 2016 WL 7422289, at *5 (C.D. Ill. May 20, 2016).  The ruling below thus denied Endless River its bargained-for remedy.

Nor does TransUnion dispute that the termination clause's purpose was to allow Endless River to profit from the source code, which, under *Midland*, is grounds

to find that these profits were direct losses. TransUnion misses the point by rejoining (2nd.Br.38) that Exhibit A of the Agreement states only that Endless River would have to pay TransUnion *if* it commercialized the source code, without guaranteeing profits. It suffices, however, that the parties expressly provided for payment obligations to be triggered by Endless River's *commercialization* of the source code. That alone confirms such profits were not "collateral to the contract" but "a direct and foreseeable consequence" of TransUnion returning the source code, as TransUnion was contractually obligated to do. *Midland*, 515 N.E.2d at 67; *see* 1st.Br.42-43. Because these profits are mentioned in the contract itself, not just highlighted in "promotional brochures," they are direct under *Midland*, 515 N.E.2d at 67, "flow naturally" from the breach, and are not an "unusual" consequence of TransUnion's actions, 24 Williston on Contracts § 64:16 (4th ed.).

TransUnion asserts (2nd.Br.43) that "Section 8.2 expressly contemplates that zero damages will be available to both parties in many circumstances," but that is untrue. Section 8.2 always preserved the right to obtain direct damages, while prohibiting only "consequential, incidental, indirect, special, or punitive damages." Appx18 (Endless River Tr. Ex. 201 § 8.2). Thus, unlike *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 841 F.3d 827, 835-37 (10th Cir. 2016) (cited in 2nd.Br.43), Endless River did not waive *all* lost profits but preserved the right to obtain *direct* lost profits. And TransUnion does not identify any damages from withholding of the new source

23

code that could be *more* direct than the loss of business opportunities the source code was intended to unlock.[2]  Denying Endless River its direct damages conflicts with Section 8.2's plain text, the parties' bargain, and the rule that "limitation of damages clauses are not favored and must be strictly construed against a benefitting party." *Aculocity, LLC v. Force Mktg. Holdings, LLC*, 2019 WL 764040, at *2 (N.D. Ill. Feb. 21, 2019).

TransUnion elides *Midland*'s core holding on direct damages, along with the jury's finding (per the instruction TransUnion consented to) that the damages awarded were "the natural and probable result of the breach," "were reasonably within the contemplation of the parties as the probable result of the breach," and were proved "in an amount which is reasonably certain."  Tr.Vol.5, R.268, PageID#14226; *see id.* at 14312 (TransUnion had "[n]o objection" to the instructions).  Nevertheless, TransUnion claims (2nd.Br.37) that, "[u]nlike the hotel … , Endless River had no funding, no platform," and that there was no "year when the Quote Exchange actually turned a profit."  But this ignores extensive testimony the jury heard as to how Endless River was positioned to exploit concrete market

---

[2]  TransUnion, by contrast, is incorrect (2nd.Br.38) to assert "there is no such thing as consequential damages" under Endless River's interpretation.  Lost profits here could be consequential if, say, TransUnion's actions deprived Endless River of an out-of-the-blue opportunity that arose between 2018 and 2022, and that neither party contemplated when the Agreement was signed.  Nor would breach of *other* provisions, such as notice and confidentiality requirements, necessarily enable recovery of lost profits as direct damages.

24

opportunities had TransUnion turned over the source code. *Supra*, Part I. Moreover, *Midland* held that lost profits *were* available as direct damages, if they could be proved with reasonable certainty, as this jury specifically found they were. 515 N.E.2d at 67. Even the district court acknowledged that there was "arguably a foreseeable causal link between TransUnion's failure to timely provide the source code, and the lost opportunity for profit," Mem.Op., R.288, PageID#14634.

As for the district court's insistence that Endless River prove damages with *certainty*, TransUnion appears to concede (2nd.Br.42) this was error, especially considering that *Midland* specifically declined to impose such a demanding burden of proof. *See* 515 N.E.2d at 66 (direct lost profits can be recovered if they are "to some extent, [] uncertain and incapable of calculation with mathematical precision"); 1st.Br.47-48. TransUnion claims (2nd.Br.42) that Endless River had "previously acknowledged that '[r]ecovery is precluded … when the *existence* of damages is uncertain'" (emphasis in original; quoting MSJ.Reply, R.131, PageID#3299). But Endless River made that concession only as to its *conversion* claim. For a contract claim, by contrast, damages are precluded only "when uncertainty exists as to the *fact of damages*, *rather than to the amount of such damages*." *Beerman v. Graff*, 621 N.E.2d 173, 179 (Ill. App. 1993) (emphasis added). Here, the jury found that the damages it awarded were recoverable under the standard—reasonable certainty—set forth in *Midland*. *See* Tr.Vol.5, R.268,

PageID#14226-27.   Last, TransUnion contends (2nd.Br.39) that Endless River "believed it could 'replicate' the code … for just $1.75-$1.85 million," but ignores testimony that Endless River could not do so because TransUnion clouded its business partnerships.   The jury was well within its rights to conclude that Endless River's profits were "not[ ]yet[ ]existing" (2nd.Br.2) only as the direct result of TransUnion's misconduct.   *Supra*, pages 6-7.

Finally, TransUnion disputes (2nd.Br.42) that Endless River proved any damages, but the jury had ample basis to find otherwise.   "[T]he plaintiff need only present evidence that tends to show a basis with which to compute the damages with a fair degree of probability."   *Doornbos Heating & Air Conditioning, Inc. v. James D. Schlenker, M.D., S.C.*, 932 N.E.2d 1073, 1090 (Ill. App. 2010).   Endless River met this burden.   TransUnion's response (2nd.Br.42)—that Dr. Malec improperly relied on the 2013 revenue projections when the evidence showed that the Quote Exchange never earned any profits—ignores Dr. Malec's actual testimony.   Dr. Malec explained why the jury should disregard actual "cash flows" when assessing damages, because "a start-up often has significant value before it even has any cash flows whatsoever."   Tr.Vol.4, R.267, PageID#13957; *supra*, pages 14, 18.   Endless River's 2013 revenue projection, by contrast, "was the only projection that took into account the market opportunity of the Quote Exchange in Endless River's hands as the date of termination, April of 2018."   Tr.Vol.4, R.267, PageID#13967.

Dr. Malec used these figures not "because Endless River 'told him' to" (2nd.Br.57; emphasis removed), but based on his careful review of "the documents in the case" and "independent economic research." Tr.Vol.4, R.267, PageID#13967, 14047. Beyond that, Endless River's experienced principals also testified to why these projections were reliable. *Supra*, pages 6, 19. And TransUnion's self-serving narrative—whereby (*e.g.*, 2nd.Br.5) Endless River approached TransUnion after "fail[ing]" to find any other partner—ignores Endless River's testimony that other would-be partners expressed strong interest before Endless River chose TransUnion. *Supra*, pages 5-7.

Whether Dr. Malec's calculations are unduly speculative would presumptively pose "a question of fact," *Doornbos*, 932 N.E.2d at 1089, and Endless River's witnesses provided strong basis for the jury to resolve that question in favor of Endless River. Although TransUnion accuses Endless River of arguing below that the dispute should be decided "as a matter of law" rather than fact (2nd.Br.40), it overlooks that Endless River was addressing (in response to TransUnion's arguments) the issue whether Section 8.2 categorically bars any consideration of lost profits. As noted *supra*, that is the line of argument TransUnion pursued below, and it was and remains doomed to fail under settled law.

It is of course true that TransUnion's arguments for invalidating the jury's verdict under Rule 50—once properly framed in terms of whether no reasonable jury

could find as this jury did—are to be decided as a matter of law.  Even so, the critical point remains that this jury was properly instructed as to the standard Endless River needed to satisfy in order to prove damages, before the jury properly found that Endless River in fact satisfied that standard and proved damages in the amount awarded.  A party like TransUnion who does not object to a jury instruction on a legal standard "tacit[ly] agree[s]" that the issue "require[s] fact-finding," and cannot object to the jury's fact-finding later, absent extraordinary grounds.  *Abellan v. Lavelo Prop. Mgmt., LLC*, 948 F.3d 820, 828 (7th Cir. 2020).

### B.    TransUnion Does Not Show That Lost Profits Are Consequential Merely Because There Are Other "Links In The Causal Chain"

TransUnion does not dispute that the district court misread *Powell*, 356 S.W.3d 113—the sole case the court relied on for its ruling that Endless River's lost profits are consequential given the existence of an additional "link in the causal chain," Mem.Op., R.288, PageID#14634 (citation omitted).  *See* 1st.Br.49-50. Instead, TransUnion pivots (2nd.Br.33-34) to citing other non–Illinois law cases (never cited below) for the proposition that any damages that "are contingent on collateral third-party agreements … are consequential, not direct."  *Airlink Commc'ns, Inc. v. Owl Wireless, LLC*, 2011 WL 4376123, at *3 (N.D. Ohio Sept. 20, 2011).  But Illinois law is to the contrary:  *Midland* acknowledged that lost profits are generally "the result of several intersecting causes," 515 N.E.2d at 66, but still held, as other courts have, that "lost profits can be categorized as [] direct …

28

damages," *Westlake Fin. Grp., Inc. v. CDH-Delnor Health Sys.*, 25 N.E.3d 1166, 1175 (Ill. App. Ct. 2015). *See* 1st.Br.47-48. TransUnion lacks any response on this point.

Ignoring *Midland*'s and *Westlake*'s contrary holdings, TransUnion misquotes (2nd.Br.33) *Reid Hospital & Health Care Services, Inc. v. Conifer Revenue Cycle Solutions, LLC*, 8 F.4th 642, 649 (7th Cir. 2021), for the proposition that "lost profits" and "lost revenue" are "classic examples of unrecoverable consequential damages." TransUnion omits, however, that this excerpt continues: "not all lost revenue is consequential by definition in all cases. Even where a class of damages is generally consequential, the ultimate determination is a relative one based on the substance and terms of the contract." *Id.* No reference is made there to a causal chain being disqualifying, and TransUnion's other cases avail it no better. *See Penncro Associates Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156 (10th Cir. 2007) (Gorsuch, J.) ("[l]ost profits ... can be recoverable as a component of either (and both) direct and consequential damages"); *Mead Corp. v. McNally-Pittsburg Manufacturing Corp.*, 654 F.2d 1197, 1209 n.17 (6th Cir. 1981) (not addressing whether lost profits may be direct damages); *Primoff v. Warfield*, 495 F. App'x 293,

299-300 & n.9 (4th Cir. 2012) (holding plaintiff did not adequately prove its damages, not that lost profits were consequential).[3]

## IV.   TransUnion Lacks Any Viable Alternative Grounds For Affirmance

Hard pressed to defend the district court's ruling, TransUnion largely argues around the ruling by pressing (2nd.Br.44-52) five purported alternative grounds for affirmance.  But none justifies the Rule 50 ruling below.

### A.   The Jury Award Is Not Barred By The "New-Business Rule"

TransUnion waived its first alternative ground for affirmance (2nd.Br.44-45), that Illinois prohibits new businesses from recovering lost profits, by omitting this argument from its Rule 50(a) motion.  *See, e.g.*, *Doherty v. City of Maryville*, 431 F. App'x 381, 384 (6th Cir. 2011).  The "new-business rule" is a mixed question of fact and law to which this waiver rule applies, not a "question[] of pure law" to which it would not.  *Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767, 785 (6th Cir. 2020).  Even TransUnion's cases (2nd.Br.44) recognize that there are

---

[3]   TransUnion also cites two Georgia-law cases (2nd.Br.34)—*Airlink* and *Atlantech Inc. v. Am. Panel Corp.*, 743 F.3d 287 (1st Cir. 2014)—addressing fundamentally different fact patterns, where a defendant fails to deliver tangible goods, thereby preventing a plaintiff from profiting under a different supply contract. Here, by contrast, Endless River "seeks only to recover [property] that [TransUnion] agreed to [deliver] under the contract," with the lost revenue evidencing the property's value. *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir. 2007) (cited in 2nd.Br.34 n.3); *see Atl. City Assocs., LLC, v. Carter & Burgess Consultants, Inc.*, 453 F. App'x 174, 180 (3d Cir. 2011) (cited in 2nd.Br.35 n.3) (citing *Penncro*).

"exceptions" to the new-business rule when "experts have provided convincing and non-speculative evidence sufficient to prove lost profits." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 633 (7th Cir. 2007); *Ivey v. Transunion Rental Screening Sols., Inc.*, --- N.E.3d ---, 2022 WL 17245179, at *6 (Ill. 2022) (characterizing the new-business rule as "a fact-intensive inquiry that differs from case to case"). Accordingly, TransUnion waived this purported ground by failing to raise it in its Rule 50(a) motion.

Waiver aside, this ground also fails on the merits given its factual aspect, combined with evidence that, once viewed in the light most favorable to Endless River, enabled the jury to find damages without unduly speculating, precisely as instructed. *Supra*, Parts I-III; *see, e.g., Tri-G, Inv. v. Burke, Bosselman & Weaver*, 856 N.E.2d 389, 407 (Ill. 2006) ("There is no inviolate rule that a new business can *never* prove lost profits.") (emphasis in original). Dr. Malec "provided convincing and non-speculative evidence" for his valuation. *TAS Distrib. Co.*, 491 F.3d at 633. And Endless River's principals testified that TransUnion's failure to return the source code eviscerated all value. *Supra*, page 7. TransUnion again criticizes (2nd.Br.45) Dr. Malec for relying on earlier projections and discounting actual sales figures but ignores Dr. Malec's pointed refutation of those criticisms. *Supra*, pages 17-19. When, as here, an expert bases his opinion about lost profits on actual marketplace conditions and "authoritative sources," the new-business rule is

31

inapplicable. *Milex Prods., Inc. v. Alra Labs, Inc.*, 603 N.E. 2d 1226, 1236 (Ill. App. 1992). "[E]vidence of past profits is not the *sine qua non* of proving damages." *Ivey*, 2022 WL 17245179, at *6 ("If a business, old or new, presents evidence to support [an] inference [of profits], it may recover.").

TransUnion's remaining cases (2nd.Br.44-45) do not support its argument. *Stuart Park Associates Ltd. v. Ameritech Pension Trust*, 51 F.3d 1319, 1328 (7th Cir. 1995), and *Meriturn Partners, LLC v. Banner & Witcoff, Ltd.*, 31 N.E.3d 451, 459 (Ill. App. 2015), merely affirmed the exclusion of evidence under the new-business rule; it did not set aside a jury verdict resting on properly-admitted evidence. And the plaintiffs in *Dunn v. CCH Inc.*, 834 F. Supp. 2d 657, 667 (E.D. Mich. 2011), *Glen Hollow Partnership v. Wal-Mart Stores, Inc.*, 1998 WL 84144, at *6 (7th Cir. 1998) (unpublished), and *M.S. Distributing Co. v. Web Records, Inc.*, 2003 WL 21087961, at *10 n.4 (N.D. Ill. May 13, 2003), similarly lacked admissible expert testimony supporting the damages calculations at issue.

## B.     The Jury Award Is Based On The Correct Breach Date

TransUnion next asserts (2nd.Br.46-47) that the verdict should be set aside on the alternative ground that "the jury awarded damages based on a legally irrelevant calculation." Again, TransUnion's premise here—that Dr. Malec "never 'calculated the value of the Quote Exchange as of April 2018'" (emphasis omitted; quoting R.214, PageID#11557)—is false. Dr. Malec told the jury that his damages

calculation was pegged to the value of the Quote Exchange in April 2018, *supra*, pages 18-19, and this evidence must be given "credence" on a Rule 50 motion. *White v. Burlington N. & Santa Fe R.Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (citation omitted). For its part, TransUnion cites only the *Daubert* hearing, which was not before the jury and lacks any bearing on whether there was "legally sufficient evidentiary basis for" the verdict. Fed. R. Civ. P. 50(a). In any case, Dr. Malec testified in the *Daubert* hearing that he "determined the value of the Quote Exchange as of 2018." *Daubert*.Tr., R.214, PageID#11556; *see infra*, Cross-Appeal, Part II.A. *Heaver v. Ward*, 386 N.E.2d 134, 137, 139 (Ill. App. Ct. 1979) (cited in 2nd.Br.47), had nothing to do with damages or setting aside a verdict, but ordered a new trial because a juror had independently researched the operative facts.

### C.    The Jury Award Excludes Prejudgment Interest

TransUnion next urges the alternative ground that Dr. Malec's valuation of the source code purportedly included prejudgment interest, but TransUnion waived this argument, too. TransUnion claims (2nd.Br.48) it is "impossible to tell *what* portion of the jury verdict includes prejudgment interest … or *whether* the jury would have awarded *any* damages at all" (emphases in original). But TransUnion could have ensured transparency on these points by requesting a special verdict under Fed. R. Civ. P. 49(a). A party who fails to "request a special verdict to indicate which factual theory or theories the jury based its verdict on" waives the right to

argue that the jury rested its decision on a potentially erroneous ground. *Pratt v. Petelin*, 733 F.3d 1006, 1011-13 (10th Cir. 2013) (collecting authorities); *see, e.g.*, *Maiz v. Virani*, 253 F.3d 641, 657 n.11 (11th Cir. 2001).

In any event, TransUnion's argument fails on the merits. It contends (2nd.Br.48) that Dr. Malec's final step in valuation method, "recognizing the value of the asset will change over time," Tr.Vol.4, R.267, PageID#13978, was a disguised use of prejudgment interest, but this is specious. The calculation that Dr. Malec reached before this final step reflected the valuation of the Quote Exchange as of "March 31st, 2014," based on the 2013 projections, the valuation multiple, and the discount rate. *Id.* at 14035. Dr. Malec's final step simply reflected that the Quote Exchange increased in value from March 2014 (the beginning of the contract relationship) to April 2018 (the date of termination). *Id.* at 14035-36. This is akin to a person appraising a house in 2018 by using a real-estate valuation from 2013 and then factoring in appreciation in comparable real estate prices from 2013 to 2018. And Dr. Malec's calculation accounted for growth after 2018 "[b]ecause a start up's value is the future growth" reflected in those years, *id.* at 14049, just as a house's present value may reflect market assumptions about future trends (*e.g.*, crime and school quality).

Finally, even if TransUnion were correct in its characterization of Dr. Malec's valuation (and it is not), the jury's award facially refutes any notion that it

incorporates the final step of Dr. Malec's analysis—the only one that TransUnion paints as reflecting prejudgment interest.  Strikingly, the jury award almost exactly tracks Dr. Malec's valuation of the Quote Exchange as of *2014*, thus subtracting out this final step of his analysis.  *Infra*, page 36.  Read fairly, the jury award strips away the allegedly offending component of the calculation.

TransUnion fails to cite (2nd.Br.47-48) a single case setting aside a jury verdict based on inclusion of prejudgment interest.  *System Development Integration, LLC v. Computer Sciences Corp.*, 886 F. Supp. 2d 873, 887 (N.D. Ill. 2012), excluded, under *Daubert*, a damages measure that included prejudgment interest, but TransUnion failed to challenge Dr. Malec's opinions on this basis in its *Daubert* motion.  *Infra*, Cross-Appeal, Part II.  The other cases it cites, *Heaver* and *Black-Hosang v. Mendenhall*, 2005 WL 3299070, at *1 (S.D. Ohio Dec. 5, 2005), involved motions for a new trial and had nothing to do with prejudgment interest.

### D.    The Jury Award Is Supported By The Evidence

TransUnion betrays desperation by arguing (2nd.Br.50) that the jury verdict must be set aside as an impermissible "compromise" because the jury awarded lower damages than Endless River requested.  Juries routinely and rightly find damages in amounts of their own choosing, consistent with their wide discretion to land anywhere within "a range that the evidence supported."  *Bridgeport Music, Inc. v. Justin Combs Pub.*, 507 F.3d 470, 480-81 (6th Cir. 2007); *see Davis v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc.*, 906 F.2d 1206, 1218 (8th Cir. 1990) (upholding jury verdict that "split the difference between" the parties' damages calculations).

Indeed, a party must produce "evidence of juror misconduct to support [the] argument that the jury's award of damages constituted an improper compromise verdict." *In re Brown*, 342 F.3d 620, 633 (6th Cir. 2003). "[T]he dollar amount of the verdict alone is insufficient to establish an unlawful compromise verdict." 75B Am. Jur. 2d Trial § 1541; *see, e.g.*, *Bavlsik v. Gen. Motors, LLC*, 870 F.3d 800, 810 (8th Cir. 2017). A party can challenge a verdict on such grounds "only where it is apparent that a verdict was reached 'by means other than a conscientious examination of the evidence.'" *In re Magnesium Corp. of Am.*, 682 F. App'x 24, 29 (2d Cir. 2017) (citation omitted); *see, e.g.*, *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009) ("[J]uries are presumed to follow the court's instructions.").

The Seventh Amendment also precludes this Court from setting aside a damages award so long as there is a "legally sufficient basis" for the jury's award. *Est. of Barnwell v. Grigsby*, 801 F. App'x 354, 373-74 (6th Cir. 2020). TransUnion does not dispute that the likeliest explanation for the jury's $18.3 million award is that it credited every step of Dr. Malec's analysis save for the final step, positing that the value of the Quote Exchange rose after 2014. *See* 1st.Br.39. TransUnion responds (2nd.Br.50) that there was "no competent evidence the jury could use to reach its $18.3 million number" (emphasis removed), however close it is to Dr.

36

Malec's $18.9 million figure. But that is belied by TransUnion's own arguments and expert testimony that Dr. Malec's figures were too high. *Supra*, pages 17-18. This testimony by TransUnion, when coupled with Endless River's testimony, provides "a legally sufficient basis in the evidence" for the jury to reach a slightly lower verdict of $18.3 million. *Jeffries v. Wal-Mart Stores, Inc.*, 15 F. App'x 252, 257 (6th Cir. 2001); *see, e.g.*, *Am Equip. Co., v. Mitsubishi Caterpillar Forklift Am., Inc.*, 152 F.3d 658, 664 (7th Cir. 1998) ("Where two experts differ the jury need not accept either's testimony in toto, but instead may choose a value within the range presented[]" and "may also reduce an expert's damage estimate without invalidating the verdict.")

As for TransUnion's speculation (2nd.Br.50) that the jury might have awarded "emotional distress damages," in disregard of the court's instructions to award for breach, that does not come close to meeting the high bar set by Rule 50. Endless River's counsel never asked the jury to compensate Endless River for its principals' emotional distress. Rather, Endless River referenced the toll that TransUnion's conduct had caused Endless River's principals in specifically rebutting TransUnion's suggestion that Endless River was seeking a windfall by "trying to take advantage of Trans[]Union's mistake." Tr.Vol.1, R.262, PageID#12881. These remarks were a fair, brief rejoinder to an accusation of exploitation—not grounds for a Rule 50 order. *See, e.g.*, *Balsley v. LFP, Inc.*, 691 F.3d 747, 764 (6th Cir. 2012)

(statements in closing did not warrant new trial where they "were made to rebut Defendant's own allegations that Plaintiffs were money-grubbing"). In any event, TransUnion failed to preserve any such argument because it never objected to Endless River's closing arguments below. *See* Tr.Vol.5, R.268, PageID#14244-45, 14265, 14301, 14306; *United States v. Renfro*, 600 F.2d 55, 57 (6th Cir. 1979) ("[A] defendant must object to improper statements made by opposing counsel during closing argument to preserve these objections for appeal.") (citation omitted); *Johnson v. Nat'l Sea Prod., Ltd.*, 35 F.3d 626, 631 (1st Cir. 1994).

The jury was therefore within its prerogatives to arrive at the damages figure it did.

### E.    The Jury Properly Rejected TransUnion's Mitigation Defense

TransUnion's final alternative argument for affirmance (2nd.Br.51-52), that Endless River failed to mitigate damages, is similarly meritless. "The duty to mitigate is an affirmative defense for which [a] Defendant bears the burden." *Exelon Bus. Servs. Co., v. Pelco Structural, LLC*, 2020 WL 7027565, at *12 (N.D. Ill. Nov. 30, 2020). And "a plaintiff need only use reasonable efforts in minimizing his damages; undue efforts or expense are not required." *Ner Tamid Congregation of N. Town v. Krivoruchko*, 638 F. Supp. 2d 913, 922 (N.D. Ill. 2009). Whether a plaintiff has properly mitigated its damages poses a classic question of fact for the trier of

fact. *See Coffey v. DSW Shoe Warehouse, Inc.*, 145 F. Supp. 3d 771, 779 (N.D. Ill. 2015).

It would be gross error for the district court to countermand the jury's finding on this fact-bound affirmative defense. TransUnion's argument hinges on its claim (2nd.Br.51) that Endless River could have avoided all its damages by rebuilding the source code for just $1.85 million. But the jury heard testimony that Endless River could not rebuild the source code after TransUnion warned all other market participants that *it* owned the intellectual property, thereby foreclosing Endless River from rebuilding and marketing the source code. *Supra*, page 7; Tr.Vol.2, R.264, PageID#13477 (agreeing "the intellectual property ownership dispute [between TransUnion and Endless River] was a blocking factor for going forward with further due diligence on a potential opportunity with Endless River"); Tr.Vol.3, R.266, PageID#13803 ("Trans[]Union had a conversation with him and told him to stay out of it…."). Nevertheless, Endless River did what it reasonably could to mitigate damages by demanding the source code back so that it could monetize the concept, and would have "tr[ied] to rebuild the code" absent TransUnion's interference. Tr.Vol.2, R.264, PageID#13624; *supra*, page 7.

This case differs vastly from *Mayster v. Santacruz*, 163 N.E.3d 246, 256 (Ill. App. Ct. 2020) (cited at 2nd.Br.52), where the plaintiff could have sold a franchise for $100,000 to the counterparty immediately after the counterparty terminated an

asset purchase agreement, "thus avoiding 100% of its damages," but simply chose not to do so.  Nor is this case like *R.R. Donnelley & Sons Co. v. Vanguard Transp. Sys., Inc.*, 641 F. Supp. 2d 707, 722 (N.D. Ill. 2009) (same), where the damages could have been avoided had the plaintiff spent "an hour of [] its time or … a few hundred dollars."  A reasonable jury had an ironclad basis to reject TransUnion's affirmative defense of mitigation, given evidence that Endless River tried to redevelop the source code with new partners, only to see TransUnion sabotage its efforts.

*    *    *

Once the erroneous ruling below is reversed, therefore, the judgment should be reversed and the jury award reinstated.

## CROSS-APPEAL

With its cross appeal, TransUnion throws everything at the wall, none of it meritorious.

## I.    This Court Should Affirm The District Court's Denial Of TransUnion's Motion For Summary Judgment And Grant Of Endless River's Motion For Partial Summary Judgment

Revisiting summary judgment, TransUnion argues (2nd.Br.52-54, 62-67) that it should have obtained judgment on Endless River's breach-of-contract claim (and TransUnion's corresponding declaratory-judgment counterclaim).  From there, TransUnion argues that the district erred by deciding that the plain language of the

Agreement obligated TransUnion to return the Quote Exchange source code in April 2018, while reserving damages "for resolution by a jury." MSJ.Op., R.170, PageID#9764-66.

The district Court's grant of summary judgment and its interpretation of the Agreement are reviewed de novo as questions of law. *Royal Ins. Co. v. Orient Overseas Container Line Ltd.*, 514 F.3d 621, 634 (6th Cir. 2008). Summary judgment is proper when "no genuine dispute as to any material fact" exists and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Griffith v. Franklin Cnty., Kentucky*, 975 F.3d 554, 566 (6th Cir. 2020).

### A. Neither Section 8.2 Nor The "New-Business Rule" Foreclosed Endless River's Damages As A Matter Of Law

TransUnion first contends (2nd.Br.53-54) that the district court should have granted summary judgment dismissing Endless River's breach-of-contract claim because Section 8.2's prohibition on consequential damages and Illinois' new-business rule "doubly barred" any potential contract damages Endless River could have received. Each argument fails.

TransUnion's cross-appeal arguments under Section 8.2 fail for the same reasons discussed above in connection with the appeal. *Supra*, Parts I-III. Nor was this argument even preserved: TransUnion argued below merely that Section 8.2 was "valid"—*not* that Endless River's damages were consequential (and not direct) lost profits. *See* Mot., R.84, PageID#657-59; Reply, R.129, PageID#2947-48. Even

41

if this argument were preserved, it would not afford grounds for summary judgment. "Illinois courts have long held that the nature of damages is a question of fact reserved for the trier of fact." *Fabiano v. City of Palos Hills*, 784 N.E.2d 258, 274 (Ill. App. 2002) (citation omitted). Ultimately, the trial record affords the best basis for assessing the permissibility of Endless River's damages theory. The district court could not properly pretermit Endless River's operative theory on summary judgment any more than it could disallow the theory post-verdict.

TransUnion also errs in arguing (2nd.Br.53-54) that the Illinois new- business rule barred Endless River's damages at the summary-judgment stage, for the reasons stated *supra*, including TransUnion's fatal failure to preserve this argument under Rule 50(a) before the jury returned its verdict. *Supra* Part III.A.

## B. The Agreement's Plain Language Refutes Transunion's Implausible And Unreasonable Interpretation

TransUnion next contends (2nd.Br.62-67), incorrectly, that the district court erred in granting summary judgment to Endless River on TransUnion's counterclaim and finding that Endless River was entitled to the Quote Exchange source code. MSJ.Op., R.170, PageID#9765-66. But the district court's ruling followed inexorably from the contract's plain terms (as TransUnion effectively recognizes by burying this argument amidst its haystack). Section 2 of the Agreement states that, upon termination of the Agreement, "intellectual property rights to the Quote Exchange concept/platform shall revert to [Endless River] as outlined in Exhibit A."

42

Appx17 (Endless River Tr. Ex. 201 § 2).  Exhibit A of the Agreement in turn

provides:

> Also, during Phase III and through 2018, should TU choose to terminate
> the Contract and should ERT continue to market and monetize the TU
> developed code, repayment of TU incurred development fees shall be
> paid to TU from future ERT revenues generated over a time period not
> to exceed 36 months.  In this instance, the Quote Exchange platform
> source code developed hereunder will revert to ERT ownership.

Appx22 (*id.* at Ex. A).  The district court explained why this language was "clear

and unambiguous":  "[u]pon termination" before the end of 2018, "the language of

the Agreement explicitly states that the Quote Exchange platform source code was

to revert to [Endless River] ownership."  MSJ.Op., R.170, PageID#9765-66.  This

was not a determination that Endless River's interpretation was merely "superior to

TransUnion's" (2nd.Br.62-63)—the court found Endless River's interpretation to be

the only sensible one.

TransUnion never mentions Section 2's unequivocal language that

"intellectual property rights to the Quote Exchange concept/platform *shall revert* to

[Endless River]."  This clause disposes of TransUnion's arguments (2nd.Br.64-67)

that the language in Exhibit A governing termination under Phase III and Phase V

somehow limits Endless River's ownership rights.  Section 2 supplies the express,

clear rule:  the source code reverts to Endless River.  At the same time, Exhibit A

specifies that TransUnion's parallel right to compensation for returning the code

depends on when (*i.e.*, what phase of development) a termination occurs, while

43

reiterating that "the Quote Exchange platform source code developed hereunder will revert to [Endless River] ownership" specifically in a Phase III termination. Appx22 (Endless River Tr. Ex. 201 at Ex. A); *see* 1st.Br.8-9; Tr.Vol.2, R.264, PageID#13250-51.

TransUnion's contrary reading makes a hash out of the Agreement. According to TransUnion (2nd.Br.65-66), Exhibit A creates "precondition[s]" that had to be satisfied before it needed to return the source code: first, Endless River would decide to "continue to market and monetize" the source code (even though that had not yet been returned); second, Endless River would "repay TransUnion's development fees" from "from future … revenues" that could never be generated without the source code; and only then "would the Quote Exchange source code revert." But Endless River could not "market and monetize" source code and derive "future revenues" from the source code before *first obtaining* the source code. Nor is it plausible to read Exhibit A as quietly disabling Section 2's straightforward rule—"intellectual property rights to the Quote Exchange concept/platform shall revert to [Endless River]"—when it really "*outlin[es]*" how the reversion would unfold. Appx17 (Endless River Tr. Ex. 201 § 2); *see also Wolfensberger v. Eastwood*, 889 N.E.2d 635, 644 (Ill. App. 2008) ("When possible, courts should construe a contract so that different provisions are harmonized, not conflicting with one another."). There is not the slightest suggestion that, as TransUnion now

contends, TransUnion could unilaterally terminate the Agreement, recoup all its development fees over a span of years, *and* withhold the Quote Exchange source code, thereby placing Endless River in a much worse position than it would be in absent any development agreement.

Nor does TransUnion fare any better at the level of individual words. The word "should" in the first two clauses sets the preconditions that, if satisfied, trigger Endless River's obligation ("shall") to repay TransUnion with future revenues. Appx22 (Endless River Tr. Ex. 201 at Ex. A). Endless River's obligation to pay is separate from, and not a precondition to, TransUnion's return of the source code, which "will revert" to Endless River, per a separate sentence of the paragraph, tracking Section 2's stand-alone prescription. TransUnion errs in responding (2nd.Br.66) that the word "shall" in the preceding sentence somehow means that "TransUnion would hold the code until Endless River could fully repay TransUnion's development fees within 36 months." As TransUnion notes (*id.*), the word "shall" signals a mandatory requirement that would be triggered upon the specified conditions, not, as TransUnion contends, a precondition to the foundational code reverting to Endless River.

TransUnion's contrary reading is also at war with other parts of the Agreement. Again, Section 2 specifies the general rule for the rights to "revert" to Endless River upon termination, which Exhibit A then echoes in specifying how

45

rights "will revert" to Endless River.  Appx17, 22 (Endless River Tr. Ex. 201 § 2, Ex. A).  Furthermore, the Agreement provides that TransUnion would "assume all intellectual property and application rights in the Quote Exchange" only at "the end of Phase V."  Appx23 (*id.* at Ex. A).  In contrast, if TransUnion "abandon[ed] … the Quote Exchange prior to the conclusion of Phase V, all intellectual property and application rights shall revert to [Endless River]."  *Id.*  TransUnion responds (2nd.Br.64) that this clause applies only when the parties reach Phase V of development, but overlooks how its reading of Phase III conflicts with what undisputedly happens during Phase V.  It is implausible to posit, as TransUnion does, that TransUnion would retain title to the source code in Phase III, then *lose* title at the beginning of Phase V, then *regain* title if the project continued until Phase V's completion.[4]

Finally, TransUnion mischaracterizes the record when it asserts (2nd.Br.66-67) that "Endless River's principal conceded he didn't know if someone else might have 'another understanding'" of the language in Phase III.  That testimony came immediately after a discussion regarding the Agreement's 180-day termination *notice* provision and did not address the Phase III language.  Tr.Vol.3, R.266,

---

[4]    TransUnion is wrong to claim (2nd.Br.64) that the summary judgment opinion "relied on language from Phase V."  The court cited Phase V merely for context and to "further" explain how Exhibit A contemplated the QE source code switching hands at various Phases.  *See* MSJ.Op., R.170, PageID#9765.

46

PageID#13849-51. Endless River's principal also made this statement after saying that the contract was "unambiguous." *Id.* at 13851. In any event, this parol evidence post-dated summary judgment and could not color a provision that was "facially unambiguous." *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 884 (Ill. 1999).

* * *

The district court's summary-judgment rulings should be affirmed.

## II. This Court Should Affirm The District Court's Denial Of TransUnion's Motion To Exclude Dr. Malec

TransUnion next claims (2nd.Br.54-60) on cross-appeal that the district court abused its discretion when it denied TransUnion's motion to exclude Dr. Malec's opinions. *Daubert*.Tr., R.214, PageID#11606-07. This Court reviews a district court's admission of expert testimony only for abuse of discretion, recognizing that "deference … is the hallmark of abuse of discretion review." *Hardyman v. Norfolk & Wester Ry. Co.*, 243 F.3d 255, 258 (6th Cir. 2001) (citation and quotation marks omitted). Accordingly, this Court will not reverse an evidentiary decision unless it is "'left with a definite and firm conviction that [the district court] committed a clear error of judgment.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008) (citations omitted). An expert's opinion is admissible under Federal Rule of Evidence 702 provided the witness is sufficiently qualified and his testimony is both relevant and reliable. *Id.* at 528-29.

After a three-hour *Daubert* hearing, the district court denied TransUnion's motion to exclude Dr. Malec's testimony because he "is clearly qualified as an expert economist and can render opinions," the "venture capital approach is appropriate in this case," and "he said he followed the methodology." *Daubert*.Tr., R.214, PageID#11607. No aspect of that constitutes an abuse of discretion.

## A.    Dr. Malec's Expert Opinions Were Relevant

Dr. Malec's opinions were relevant because they would "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. TransUnion nonetheless challenges (2nd.Br.56) relevancy based on arguments already dispelled *supra*: that Dr. Malec supposedly (1) did not calculate damages as of the date of TransUnion's breach; (2) offered a valuation method that constituted impermissible consequential damages; (3) and proposed a method barred by Illinois' new-business rule.

These arguments fail for the reasons noted *supra*, especially when the rulings are reviewed for abuse of discretion. *First*, Dr. Malec testified *almost 20 times* at the *Daubert* hearing that his damages calculations measured the value of the Quote Exchange as of April 2018, the date TransUnion terminated the Agreement. *Daubert*.Tr., R.214, PageID#11507-10, 11516, 11518-20, 11526-27, 11532-33, 11541-42, 11548, 11552-53, 11556, 11560, 11566, 11585, 11590, 11593, 11595-96; *see also supra*, pages 18-19. *Second*, Dr. Malec's damages figure measured the

Quote Exchange's diminution in value caused by TransUnion's breach, not consequential damages. *Daubert*.Tr., R.214, PageID#11508, 11542-44, 11547, 11560, 11581, 11593; *see also supra*, Parts II-III. *Third*, the new-business rule did not apply because Dr. Malec applied the "authoritative" venture capital approach and assessed actual marketplace conditions. *Daubert*.Tr., R.214, PageID#11607 ("The question is whether this venture capital approach is appropriate in this case, and apparently … it is. And [Dr. Malec] said he followed the methodology."); *Milex Prods.*, 603 N.E.2d at 1237; *see supra*, Part IV.A.[5]

## B.    Dr. Malec's Expert Opinions Were Reliable

Dr. Malec's opinions were also sufficiently reliable. The court has "discretion" in deciding "what factors to apply and what conclusion to draw about an expert's reliability." *United States v. Mallory*, 902 F.3d 584, 593 (6th Cir. 2018). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 529-30. Moreover, "'rejection of expert testimony is the exception, rather than the rule,' and [this Court] will generally permit

---

[5] The court also rejected TransUnion's assertion (2nd.Br.12) that Dr. Malec's opinions were unreliable because Endless River's initial (and later amended) response to a contention interrogatory had estimated $21 million in damages. *Daubert*.Tr., R.214, PageID#1568.

testimony based on allegedly erroneous facts when there is some support for those facts in the record.'" *Id.* at 530 (citation omitted).

Noting that its role was to "function as a gatekeeper [] and not as an evaluator of the credibility of the witnesses," the district court found that "Dr. Malec is clearly qualified as an expert economist." *Daubert*.Tr., R.214, PageID#11607. "The question is whether this venture capital approach is appropriate in this case, and apparently based on the evidence before me, it is. And he said he followed the methodology." *Id.* Any other disputes "go[] to the weight of the evidence, not ... admissibility." *Id.*

TransUnion's contrary arguments are unavailing. It first contends (2nd.Br.57-58) that Dr. Malec "blindly adopted" Endless River's revenue projections in the first step of his methodology, but the record shows otherwise. Again (*supra*, pages 19, 26), Dr. Malec explained that, in accordance with the venture-capital approach, he used Endless River's 2013 financial projections because they were the most reliable, consensus estimate of how Quote Exchange would perform. Malec.Dep., R.184-1(sealed),[6] Pages:62, 80-81; Malec.Rep., R.201-9, PageID#11115-16; *Daubert*.Tr., R.214, PageID#11558. Nor is this approach aberrant: "Expert witnesses routinely rely on financial and accounting information provided by parties in support of their analysis." *Supervalu, Inc. v. Associated Grocers, Inc.*, 2007 WL 624342, at *6 (D.

---

[6] Docket entry 184-1 is sealed such that counsel cannot access the PageID#.

Minn. Jan. 3, 2007).   Any quarrels TransUnion had with Dr. Malec use of these projections was proper grist for cross-examination, not exclusion.

Nor did Dr. Malec "blind[] himself to the Quote Exchange's actual revenue history" (2nd.Br.59; emphases removed).   *See supra*, pages 14-15, 18, 26.   Rather, he opined that the Quote Exchange's actual performance shined no light on the Quote Exchange's actual value because it did not reflect the "market opportunity that existed for the Quote Exchange."   *Daubert*.Tr., R.214, PageID#11558-59. Moreover, the Quote Exchange's "actual results" were especially misleading here because they were skewed by "TransUnion's developmental" and "contractual delays."   *Id.* at 11559; *see also* Malec.Dep., R.184-1(sealed), Page:108 (explaining that actual results "ha[ve] nothing to do with the valuation in terms of what a value of an asset is worth").   Dr. Malec's decision to discount the Quote Exchange's actual revenue performance was reasonable and consonant with accepted valuation methodology.   *See* Malec.Dep., R.184-1(sealed), Pages:109-110.

TransUnion is also incorrect in contending (2nd.Br.59) that Dr. Malec "entirely made up" his methodology by adding an improper "growth step" to the final part of his analysis.   Dr. Malec explained why this step was proper:   his methodology would otherwise value the Quote Exchange only as of 2014, based on 2013 projections, whereas it was reasonable to "recogniz[e] that the value of an asset will grow over time based on its expected rate of return."   *Daubert*.Tr., R.214,

PageID#11508; *see* Malec.Rep., R.201-9, PageID#11119-21; *supra*, pages 33-34. While TransUnion was free to question Dr. Malec about his chosen growth rate, that could not possibly afford valid basis for exclusion. *See Somotext Corp. v. Zoove, Inc.*, 2020 WL 533006, at *9 (N.D. Cal. Feb. 3, 2020) ("the source of [the expert's] net growth rates goes to the weight of his testimony").

None of the cases TransUnion relies on (2nd.Br.58-59) parallels this one. The expert in *Sheffield v. International Paper Co.*, 2020 WL 1882906, at *2 (W.D. Tenn. Feb. 26, 2020), could "not explain why his methodology is valid or why his conclusions are neither arbitrary nor contrary to the body of data provided in this case." The expert in *Rose v. Truck Centers, Inc.*, 388 F. App'x 528, 533-36 (6th Cir. 2010), did not conduct any testing to determine what caused the relevant accident and could not identify any tests by anyone else validating his theory. The expert in *Ok Yeon Yoon v. K-Ltd. Carrier, Ltd.*, 2020 WL 1031486, at *5 (N.D. Ohio Mar. 3, 2020), who opined about how a truck driver died, "cherry-picked his facts" and ignored blood-test results showing that the driver did not have drugs in his system one hour after dying. Finally, in *In re FCA US LLC Monostable Elec. Gearshift Litig.*, 2022 WL 944285, at *9 (E.D. Mich. Mar. 29, 2022), the expert contradicted himself, did not offer any "readily apparent" principles or methods underlying his opinion, and did not reliably apply any of those methods to the facts of the case.

Here, Dr. Malec performed his valuation analysis according to the established venture-capital approach and reliably applied that method. *Daubert*.Tr., R.214, PageID#11607. It was well within the trial court's discretion to let Dr. Malec testify, to let TransUnion ventilate its challenges at trial, and to let the jury decide for itself what weight to afford Dr. Malec's testimony.

## III.    This Court Should Affirm The District Court's Denial Of TransUnion's Motions In Limine To Exclude Dr. Malec

Finally, TransUnion gains nothing by recycling the same arguments (2nd.Br.60-62) under the heading that the district court supposedly abused its discretion in denying TransUnion's motions in limine to exclude evidence of Dr. Malec's damages calculations. This Court reviews "a district court's ruling on a motion in limine for abuse of discretion," *Branham v. Thomas M. Cooley Law Sch.*, 689 F.3d 558, 562 (6th Cir. 2012), and there was no abuse of discretion here, for the reasons already explained.

TransUnion contends (2nd.Br.60-61) that this Court should reverse the in-limine rulings for many of the same reasons raised in other sections of its brief—that Dr. Malec included an allegedly improper "growth" step in his analysis, and that Section 8.2 and Illinois' new-business rule preclude his valuation. These arguments do not strengthen through repetition and retain the flaws noted *supra*, Argument, Parts I-IV.A. If anything, TransUnion's arguments are even weaker on this procedural posture: this Court discourages "the use of a motion in limine to litigate

or relitigate matters that should be resolved via a ... summary judgment motion." *Porter v. AAR Aircraft Servs., Inc.*, 790 F. App'x 708, 713 (6th Cir. 2019).

TransUnion's only distinct argument (2nd.Br.61-62) here—that Dr. Malec should not have been able to testify about the value of the Quote Exchange as of April 2018 because he purportedly did not disclose this opinion until the *Daubert* hearing—is feeble. Dr. Malec clarified at the *Daubert* hearing that his report expressly "estimated damages as of the date of termination, April of 2018," even though it does not use the words "April 2018." *Daubert*.Tr., R.214, PageID#11516; *see supra*, pages 18-19. The factual predicate for TransUnion's argument is therefore wrong.

Finally, the district court could not have abused its discretion here because Dr. Malec's methodology was disclosed by the *Daubert* hearing at the latest. "[A] *Daubert* hearing can serve to elucidate the basis for an expert opinion" that is unclear from the report. *United States v. Roberts*, 830 F. Supp. 2d 372, 387 (M.D. Tenn. 2011) (citations and internal quotation marks omitted); *see, e.g.*, *Thompson v. Doane Pet Care Co.*, 470 F.3d 1201, 1203 (6th Cir. 2006); *In re E.I. du Pont de Nemours and Co. C-8 Personal Injury Litig.*, 348 F. Supp. 3d 650, 663 (S.D. Ohio 2016). Accordingly, courts routinely deny motions to exclude expert opinions when a piece of information is consistent with, but not explicitly included in an expert's report, as TransUnion claims is true here. *See U.S. Diamond & Gold v. Julias Klein Diamonds*

*LLC*, 2008 WL 4116090, at *9 (S.D. Ohio Aug. 28, 2008); *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Prods. Liab. Litig.*, 2020 WL 8707603, at *6 (S.D. Ohio Apr. 16, 2020); *Roach v. Hughes*, 2015 WL 3970739, at *9 (W.D. Ky. June 30, 2015).

In any event, TransUnion suffered no appreciable prejudice given that it cross-examined Dr. Malec as it saw fit at trial, including with the benefit of his *Daubert* testimony. *See, e.g.*, *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he party that 'seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted.'") (citation omitted).

As such, the district court did not abuse its discretion by denying TransUnion's motions in limine, and TransUnion suffered no prejudice.

## CONCLUSION

For these reasons and those previously stated, this Court should reverse the district court's post-trial judgment, reject TransUnion's alternative grounds for affirmance and cross-appeal, and remand with instructions for the district court to reinstate the jury award.

.

55

Dated: September 8, 2023      Respectfully submitted,

*/s/ Derek L. Shaffer*

Stephen J. Rosenfeld      Derek L. Shaffer
MCDONALD HOPKINS LLC      QUINN EMANUEL URQUHART
300 North LaSalle, Suite 1400        & SULLIVAN, LLP
Chicago IL 60654      1300 I Street NW, 9th Floor
(312) 280-0111      Washington, D.C. 20005
srosenfeld@mcdonaldhopkins.com      (202) 538-8000
      derekshaffer@quinnemanuel.com

*Attorneys for Plaintiff-Appellant and Cross-Appellee*
*Endless River Technologies LLC*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R.App. P. 28.1(e)(1) because it contains 12,973 words (based on the Microsoft Word word-count function) excluding the parts of the brief exempted by Fed. R.App. P. 32(f).

This brief complies with the typeface requirements of Fed. R.App. P. 32(a)(5) because it has been prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman, 14-point type, and with the type-style requirements of Fed. R.App. P. 32(a)(6).

*/s/ Derek L. Shaffer*
Derek L. Shaffer
*Attorney for Plaintiff-Appellant
and Cross-Appellee*

**CERTIFICATE OF SERVICE**

I, Derek L. Shaffer, a member of the Bar of this Court, hereby certify that on September 8, 2023, I electronically filed the foregoing "Third Brief on Appeal by Appellant and Cross-Appellee Endless River Technologies LLC" with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the appellate CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Derek L. Shaffer*
Derek L. Shaffer
*Attorney for Plaintiff-Appellant and Cross-Appellee*

**DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS**

Pursuant to Sixth Circuit Rules 28(b)(1)(A)(i) and 30(g)(1), Endless River additionally designates the below document from the district court's electronic record.

| Record Entry # | Description of Document | Page ID Range |
|---|---|---|
| 184-1 | Excerpts from Deposition of Andrew Malec, Vol. I (Feb. 25, 2022) | 10186 (Sealed) |