NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0530n.06

Case Nos. 23-3087/3144

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Dec 18, 2024
KELLY L. STEPHENS, Clerk

| | |
|---|---|
| ENDLESS RIVER TECHNOLOGIES, LLC, | ) |
| Plaintiff - Appellant / Cross - Appellee, | ) ) |
| v. | ) ) ) | 
| TRANSUNION, LLC, | ) ) |
| Defendant - Appellee / Cross - Appellant. | ) ) |

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

Before: BATCHELDER, STRANCH, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. This case arises from a contract dispute over the development and ownership of the "Quote Exchange," an online marketplace where insurance companies buy and sell insurance leads. Endless River Technologies, LLC ("Endless River") filed this lawsuit against TransUnion, LLC ("TransUnion") to recoup the damages that Endless River purportedly suffered after TransUnion refused to return the Quote Exchange's source code—a key element of the Quote Exchange platform—as required by the parties' agreement once their partnership dissolved. After a jury returned a verdict awarding Endless River $18.3 million in damages, TransUnion filed a motion for judgment as a matter of law, challenging Endless River's recovery on multiple grounds. The district court granted the motion and vacated the award. Endless River now appeals, and TransUnion cross-appeals. For the following reasons, we AFFIRM the district court's vacatur of the jury's award, albeit on alternative grounds.

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

I.

*Background.* In 2009, Richard Bonitz, a former insurance industry executive, and his business associates formed Endless River to formulate the concept for a platform that could "streamline comparative insurance price-quoting" for insurance carriers and consumers. (R. 170, PageID 9753). After some internal development, this concept became the Quote Exchange platform, an online marketplace through which insurance companies could trade insurance leads. Over the next several years, Endless River met with various insurance companies to confirm market interest in the Quote Exchange platform and collect data to further inform the platform's development.

In time, Endless River felt it had developed a "solid business model," using information it had gathered from industry players. (R. 265, PageID 13608). And in the latter half of 2012, it created a pre-development profit projection model, intended to forecast the revenue that the Quote Exchange platform would generate over a five-year period. The profit projection called for an initial year of development, during which no revenue would be generated. Then, Endless River estimated that the Quote Exchange platform would generate $16.7 million during its first year on the market and about $213 million by year four. Endless River shared this profit projection when pitching the Quote Exchange platform to companies in hopes of securing a partnership that would bring the digital concept into fruition.

In January 2013, Endless River met with TransUnion to discuss such a partnership and present its profit projection. TransUnion expressed interest in the platform and asked for an exclusive opportunity to work with Endless River. The following year, on March 31, 2014, the parties entered into a Development Agreement and Contract for Services ("the Agreement").[1]

---

[1] The parties agree that Illinois law governs the Agreement.

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

Under the terms of the Agreement, TransUnion would fund the development of the Quote Exchange platform while Endless River would act as a product design and technical consultant for an annual fee. Section 8.2 of the Agreement broadly limited the parties' respective liabilities, specifically barring potential claims for the recovery of consequential damages and lost profits:

> In no event shall either party be liable for, and both [TransUnion] and [Endless River] hereby waive as to the other party, any consequential, incidental, indirect, special, or punitive damages incurred by the other party and arising out of the performance of this contract, including but not limited to loss of good will and lost profits or revenue, whether or not such loss or damage is based in contract, warranty, tort, negligence, strict liability, indemnity, or otherwise, even if such party has been advised of the possibility of such damages. These limitations shall apply not withstanding any failure of essential purpose or any limited remedy.

(Appendix 18, ECF 32, Page 20) (converted to sentence case from all caps).

From 2014 to 2017, Endless River and TransUnion worked to bring the Quote Exchange platform to market. Unfortunately, during this period, both parties were dissatisfied with the platform's development and performance. Endless River complained that TransUnion's alleged poor management decisions delayed the Quote Exchange's market launch, while TransUnion questioned the financial viability of the business venture following the platform's failure to meet revenue expectations. At some point, the Quote Exchange did become operational and secured some insurance carriers who agreed to join the platform. However, the Quote Exchange platform generated only $240,000 in revenue between 2016 and 2018—a figure far lower than the estimates in Endless River's profit projection.

On October 4, 2017, TransUnion formally notified Endless River of its intention to exercise its right to unilaterally terminate the parties' Agreement due to the Quote Exchange's underperformance. Endless River claimed to be "genuinely excited" about the end of the partnership, explaining that it no longer had to "suffer[] through TransUnion's red tape" because

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

it now had working software and insurance carriers seeking to use the Quote Exchange platform. (R. 264, PageID 13251). More importantly, Endless River believed that it maintained the "first mover advantage" in the market because, at that time, the Quote Exchange platform remained, in its opinion, an innovative and trail-blazing technology with a host of opportunities available "to generate real revenue." (*Id.* at 13263, 13268).

Termination became effective on April 2, 2018, and a battle over the intellectual property related to the Quote Exchange platform ensued. Endless River argued that the terms of the Agreement obligated TransUnion to return the "source code," a key software element of the Quote Exchange platform, at termination. TransUnion disagreed, asserting that the Agreement entitled Endless River to only the "Quote Exchange concept as originally presented" and not the source code, which TransUnion had developed during the partnership. (Appendix 24, ECF 32, Page 26).

*Procedural History.* Unable to reach a resolution, Endless River filed this lawsuit against TransUnion in April 2018, about three weeks after termination, alleging breach of contract and multiple tort claims.[2] In particular, Endless River maintained that, under the terms of the Agreement, ownership of the Quote Exchange platform, as developed during the course of the parties' partnership, reverted back to Endless River upon TransUnion's termination. It contended that TransUnion's refusal to return the source code not only violated the terms of the Agreement, but also jeopardized Endless River's ability to market and monetize the Quote Exchange platform

---

[2] In addition to the breach of contract claim, Endless River raised six other claims, alleging seven counts in total: (1) trade secret misappropriation arising under the Defend Trade Secrets Act, 18 U.S.C. § 1863, et seq.; (2) conversion; (3) defamation; (4) slander of title; (5) tortious interference with business expectancy; and (6) violation of Ohio Deceptive Trade Practices Act. These claims are not at issue on appeal. TransUnion filed two counterclaims for breach of contract and a declaratory judgment, which are likewise not at issue on appeal. TransUnion's breach of contract claim alleged, among other things, that Endless River breached their Agreement by wrongfully asserting that it owned the source code. In the same vein, TransUnion's declaratory judgment sought a finding from the district court that TransUnion reserved all right, title, and interest to the source code as well as other associated intellectual property.

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

with other partners. According to Endless River, the market window for this groundbreaking technology had closed, and the source code was now worthless. Endless River sought the return of the source code as well as the damages flowing from this lost opportunity.

Both parties moved for partial summary judgment. On February 2, 2022, the district court granted both motions in part, dismissing only Endless River's conversion claim and TransUnion's request for declaratory judgment. In so doing, the district court determined that the language of the Agreement was clear and unambiguous in providing that ownership of the source code would revert back to Endless River at termination. Some time after this ruling, TransUnion returned the source code to Endless River, and the parties agreed that the district court's summary judgment finding established that TransUnion had breached their Agreement for purposes of the lawsuit. The case proceeded to trial to determine the appropriate damages amount.

On June 7, 2022, TransUnion moved to exclude Endless River's damages expert, Dr. Andrew Malec. In Dr. Malec's expert report, he opined that Endless River's damages totaled approximately $59.4 million based on what the value of the Quote Exchange platform would have been as of December 1, 2021 (the date of his expert report's disclosure) if TransUnion had not breached and Endless River had been able to monetize the platform. To measure this value, Dr. Malec used what he described as the "venture capital approach," a methodology used to calculate the value of start-up companies based on their expected future revenues. Using this approach, Dr. Malec relied on Endless River's profit projection as his primary data input and (1) assumed that the Quote Exchange's revenues from 2014 to 2018 totaled $213 million based on the profit projection's estimation of the Quote Exchange's future sales; (2) identified comparable companies; (3) chose a valuation multiple of 1.1 based on those companies; (4) multiplied the estimated revenues ($213 million) times the multiple (1.1) to get an "enterprise value" of $234 million as of

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

2018; (5) chose a "discount rate" of 70% based on perceived market risk and applied it in a present-value calculation, which decreased the 2018 enterprise value ($234 million) to a presumed value of $18.9 million as of March 31 2014—the date the parties signed their Agreement; and then (6) calculated a "revenue growth rate," based on the comparable companies, to grow the $18.9 million figure as of March 2014 to the Quote Exchange's present value of $59.4 million as of December 2021. Although Dr. Malec later admitted that this final step of "growing" the Quote Exchange's value from March 2014 to December 2021 was not a technical step outlined within the economic literature for the venture capital approach, he explained that applying the growth step was necessary to account for the time value of money and his belief that an asset like the Quote Exchange would grow in value over time. TransUnion challenged the admissibility of Dr. Malec's testimony on several grounds, principally asserting that his calculations and methodology were irrelevant and unreliable.

On September 1, 2022, the district court held a *Daubert* hearing to consider TransUnion's motion, which it denied from the bench. The district court construed TransUnion's challenge as raising the narrow question of whether the venture capital approach was an appropriate method to measure Endless River's damages. Finding no fault in the method or its application here, the district court determined that TransUnion's remaining complaints about Dr. Malec's report went "to the weight of the evidence" rather than the admissibility of Dr. Malec's opinions. (*Id.*). The district court nevertheless reserved the right to "keep an open mind" and reevaluate its decision based on witness testimony at trial because Endless River's damages "[s]eem to be" a "moving target." (*Id*. at 11607–09). Days later, Endless River disclosed Dr. Malec's revised calculations, which adjusted Endless River's damages total to $55.2 million as of September 12, 2022—the date of trial.

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

At trial, the district court did not revise its earlier decision, and Endless River exclusively relied on Dr. Malec's updated conclusion that the company's damages amounted to $55.2 million based on what the value of the Quote Exchange platform would have been absent TransUnion's breach. At the close of evidence, the district court instructed the jury to determine whether Endless River had proven damages and, if so, in what amount. After deliberating, the jury determined that Endless River had proven it suffered damages proximately caused by TransUnion's failure to timely return the Quote Exchange source code in the amount of $18.3 million—a figure not presented through Dr. Malec's testimony. And the district court entered judgment consistent with the jury's verdict.

Following the verdict, TransUnion moved for judgment as a matter of law, asserting on multiple grounds that Endless River could not recover the jury's award. Relevant here, it argued that (1) Endless River's proven damages constituted lost profits, which are a form of consequential damages barred under Section 8.2 of the Agreement, and (2) the jury's award was speculative and unsupported by competent evidence. Endless River countered, among other things, that the jury's award was permissible under Section 8.2 because Endless River's proven damages were direct, rather than consequential, given that they flowed from TransUnion's failure to timely return the source code as required by the Agreement.

The district court granted TransUnion's motion, exclusively focusing on TransUnion's assertion that Endless River's proven damages amounted to lost profits. The district court noted that there are instances in which lost profits can constitute direct damages under Illinois law but concluded that was not the case here. According to the district court, "the direct damages associated with" TransUnion's breach would have been the value of the source code unlawfully kept by TransUnion. (R. 288, PageID 14634). But Dr. Malec never attempted to prove the source

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

code's value, observed the district court; he only estimated Endless River's lost profits from TransUnion's breach. This resulted in Endless River's only offering evidence of consequential damages, which were specifically barred by the Agreement. The district court therefore vacated the jury's award. Endless River appealed, and TransUnion cross-appealed.

II.

This appeal centers on the character and admissibility of Endless River's damages evidence. Endless River asks this court to reinstate the jury's $18.3 million award, asserting that the district court erred when it categorized its proven damages as "consequential" rather than "direct." On cross-appeal, TransUnion faults the district court for failing to dispose of Endless River's breach of contract claim sooner and asks that this court reverse several of the district court's pre-trial and trial rulings, which would have resolved its many challenges to the admissibility of Dr. Malec's testimony. Here, we limit our analysis to TransUnion's challenge to the district court's denial of its motion to exclude expert testimony, as the resolution of that issue is dispositive.

We agree that Dr. Malec's testimony was riddled with defects. Although our review of a district court's decision to either admit or exclude evidence is deferential, *see In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528 (6th Cir. 2008), on this record, we find that Dr. Malec's inconsistent and speculative testimony necessitates the reversal of the district court's denial of TransUnion's motion to exclude, *see Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670–71 (6th Cir. 2010) (excluding testimony where expert's chain-of-causation testimony was supported by nothing more than "speculative jumps"). Because damages are an essential element of a breach-of-contract claim and Dr. Malec's testimony was the only damages evidence Endless River presented in support of its claim, this finding in turn bars Endless River from recovering the jury's

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

award as a matter of law. *Westlake Fin. Grp. v. CDH-Delnor Health Sys.*, 25 N.E.3d 1166, 1174 (Ill. App. Ct. 2015) ("Damages are an essential element of a breach-of-contract claim, so a plaintiff's failure to prove damages entitles the defendant to judgment as a matter of law."); *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 249–50 (6th Cir. 2001) (quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 457 (2000)) ("[A]n appellate court's authority 'to direct the entry of judgment as a matter of law extends to cases in which, on excision of testimony erroneously admitted, there remains insufficient evidence to support the jury's verdict.'"). Thus, we affirm the district court's vacatur of the jury's verdict on that basis. *See Murphy v. Nat'l City Bank*, 560 F.3d 530, 535 (6th Cir. 2009) ("Appellate courts may affirm on alternative grounds supported by the record.").

### III.

We apply the Federal Rules of Evidence to assess the admissibility of Dr. Malec's testimony in this diversity case. *Legg v. Chopra*, 286 F.3d 286, 289 (6th Cir. 2002). Federal Rule of Evidence 702 governs the admissibility of expert testimony and generally requires that (1) the expert "be qualified by 'knowledge, skill, experience, training, or education'"; (2) the expert's testimony be relevant such that it "will assist the trier of fact"; and (3) the expert's testimony be reliable. *Scrap Metal*, 527 F.3d at 528–29 (quoting Fed. R. Evid. 702). Endless River, as the party proffering the expert testimony, must establish each requirement by a preponderance of the evidence. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008).

Because "[e]xpert evidence can be both powerful and quite misleading," district courts must "exercise[] more control over experts than over lay witnesses." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). As a result, Rule 702 "imposes a special obligation upon a trial judge to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert*, 509 U.S. at 589).

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

Relevance "requires a valid scientific connection to the pertinent inquiry as a precondition for admissibility." *Daubert*, 509 U.S. at 592. In other words, relevant evidence is "sufficiently tied to the facts of the case" such that it will "aid the jury in resolving a factual dispute." *Id*. at 591 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). Reliability speaks to whether an expert's testimony "is based upon 'sufficient facts or data,' whether the testimony is the 'product of reliable principles and methods,' and whether the expert 'has applied the principles and methods reliably to the facts of the case.'" *Scrap Metal*, 527 F.3d at 529 (quoting Fed. R. Evid. 702).

We review for abuse of discretion a district court's decision to admit or exclude expert testimony. *Tamraz*, 620 F.3d at 668. Under this standard, we reverse only when we are left with "the definite and firm conviction that the district court made a clear error of judgment in its conclusion." *Gaeth v. Hartford Life Ins.*, 538 F.3d 524, 529 (6th Cir. 2008).

A.

*Relevance of Testimony.* TransUnion first challenges the relevance of Dr. Malec's calculations, asserting that he measured Endless River's lost profits from the start of the parties' Agreement (March 31, 2014) up to the first day of trial (September 12, 2022), rather than starting at the date of breach (April 2, 2018). Because, under Illinois law, the proper date for determining damages for a breach-of-contract claim is the date of that alleged breach, TransUnion argues that Dr. Malec's calculations are not "sufficiently tied" to the facts of this case because they say nothing of the value of the Quote Exchange's source code on the legally relevant date.[3] We agree.

---

[3] TransUnion also maintains that Endless River's damages evidence amounted to a measurement of lost profits, a form of damages barred by the Agreement and Illinois's "new business rule." We are not convinced that Dr. Malec's calculations amounted to a measurement of lost profits and therefore decline to decide whether the parties' Agreement foreclosed the damages award on this basis. To that end, we also decline to opine as to whether the new business rule—which generally "precludes expert witnesses from speculating about possible lost profits" for new companies, *Ivey v. Transunion Rental Screening Sols., Inc.*, 186 N.E.3d 1076, 1085 (Ill. App. Ct. 2021)—applies here.

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

Under Illinois law, "the proper date for determining damages in a breach of contract action is the date of the breach, not the date of trial." *Sys. Dev. Integration, LLC v. Comput. Scis. Corp.*, 886 F. Supp. 2d 873, 886 (N.D. Ill. 2012) (interpreting Illinois law); *see also 1472 N. Milwaukee, Ltd. v. Feinerman*, 996 N.E.2d 652, 658–59 (Ill. App. Ct. 2013); 25 C.J.S. Damages § 111 ("The general rule is that damages, in an action for breach of contract, are to be measured as of the date of the breach."). Thus, the appropriate measure of damages was the value of the Quote Exchange source code as of April 2, 2018.

Here, neither Dr. Malec's original report nor his revised calculation indicate that he measured Endless River's damages as of the appropriate date. Instead, the record shows that he first measured the value of the Quote Exchange platform as of March 31, 2014, carried that value forward to measure the expected value of the platform as of December 1, 2021 (original report), and then later updated this figure to account for the expected value of the platform as of September 12, 2022 (revised calculation). Specifically, Dr. Malec concluded in his original report that he "estimated [the] value of the QE program at $18.9 million as of March 31, 2014" and that "the value of the Quote Exchange Program was $59,400,000 as of December 1, 2021." (R. 201-9, PageID 11119, ¶ 43; 11123, ¶ 54). He reiterated this position in a rebuttal report, which Endless River disclosed on July 15, 2022: "Should [TransUnion] be found liable in this matter, my opinion that the value of the [Quote Exchange source code] was $59,400,000 as of December 1, 2021 is based upon sufficient evidence and reasonable certainty." (R. 192-1, PageID 10521, ¶ 44).

With no discussion or even mention of the Quote Exchange source code's value as of April 2, 2018, Dr. Malec's testimony simply could not assist the factfinder in determining the appropriate amount of damages that would place Endless River in the position it would have been in if TransUnion had returned the source code at the time of termination as contemplated by the parties'

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

Agreement. *See Santorini Cab Corp. v. Banco Popular N. Am.*, 999 N.E.2d 46, 52 (Ill. App. Ct. 2013) (quoting *LeFevour v. Howorka*, 586 N.E.2d 656, 658 (Ill. App. Ct. 1991) ("The measure of damages for breach of contract is the amount that will compensate the aggrieved party for the loss 'which either fulfillment of the contract would have prevented or which the breach of it has entailed.'")).

Endless River resists this reading of Dr. Malec's expert reports, asserting that he clarified (no less than twenty times) during the *Daubert* hearing that he had in fact measured Endless River's damages as of April 2, 2018. This testimony, Endless River argues, is due credence and frames the question of when Dr. Malec measured damages as an issue of credibility not admissibility. We disagree.

To be certain, Dr. Malec did testify during the *Daubert* hearing that he had measured the value of the source code as of April 2, 2018. In fact, the district court determined that Dr. Malec's assurances that he followed the venture capital approach were enough to find that Dr. Malec's testimony was relevant enough to be heard by the jury. But in so holding, the district court overlooked the fact Dr. Malec's testimony not only flatly contradicts his expert reports, but also his prior sworn statements. During Dr. Malec's February 25, 2022, deposition, he testified that he had been asked to calculate the value of the Quote Exchange, which he determined to be $59.4 million as of December 1, 2021. To reach this $59.4 million figure, Dr. Malec explained that he "produced a value" based on March 31, 2014, "because that was the date of the [parties'] agreement." (R. 180-1, PageID 9841, p. 68:3–7). He then "grew" that value to arrive at a total of $59.4 million as of December 1, 2021—the date of his original report. (*Id.* at 68:7–10). Months later, during Dr. Malec's August 18, 2022, deposition, he confirmed that he "didn't do any damage calculation as of 2018." (R. 212-1, PageID 11484).

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

At the parties' *Daubert* hearing—just one week before trial—Dr. Malec suddenly changed course, testifying at that time (and for the first time) that he had in fact "estimated damages as of the date of termination, April of 2018." (R. 214, PageID 11516). But, even then, he described his method as determining economic damages as of March 31, 2014—rather than April of 2018—and then bringing them forward to December 1, 2021. At no point did Dr. Malec provide a specific numerical valuation for the code as of April of 2018 that differed at all from his March 31, 2014, calculation or his December 1, 2021, calculation. He simply asserted repeatedly that this same calculation was a valuation as of the date of termination.

When confronted with his prior sworn statements, Dr. Malec blamed the stark discrepancy on a "memory lapse" regarding the Agreement's termination date, all while acknowledging that neither of his expert reports referenced the actual date of termination. (*Id.* at 11546). And, perhaps most troubling, Dr. Malec's revised calculation, which Endless River disclosed after the *Daubert* hearing but before trial, reduced the estimation of Endless River's final damages amount from $59.4 million to $55.2 million while explicitly maintaining its representation that this newest figure had been measured as of September 12, 2022, the date of trial, rather than April of 2018. (R. 276-3, PageID 14396). Given the breadth of these contradictory findings, it would be unreasonable to find that Dr. Malec's rote mentions of "April 2, 2018" peppered throughout his testimony merely created a credibility issue for the jury to decide. Instead, this conflicting testimony wholly undermined the admissibility of his testimony. *See Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 527 (6th Cir. 2014) (providing that expert testimony "is inadmissible when the facts upon which the expert bases his testimony contradict the evidence" (quoting *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999))); *see also Rose v. Truck Ctrs., Inc.*, 388 F. App'x 528, 536 (6th Cir.

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

2010) (holding that the district court did not abuse its discretion when excluding expert testimony which contradicted evidence in the record).

B.

*Reliability of testimony.* But even if the relevance of Dr. Malec's calculations did not render his testimony inadmissible, his opinion's unreliability would. "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Scrap Metal*, 527 F.3d at 529–30. To meet this task, the district court "must concentrate 'solely on principles and methodology, not on the conclusions that they generate.'" *Ask Chems., LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 509 (6th Cir. 2014) (quoting *Daubert*, 509 U.S. at 595). This mandate, however, does not "require a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Indeed, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id*. This is because, "an expert's opinion must be supported by more than subjective belief and unsupported speculation and should be supported by good grounds based on what is known." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800–01 (6th Cir. 2000) (citation omitted). By deferring to Dr. Malec's testimony that he applied the venture capital approach without assessing whether he did so with the rigor required by *Daubert* and Rule 702, the district court did not adequately undertake this reliability inquiry.

TransUnion articulates three grounds for its challenge to the reliability of Dr. Malec's damages calculation: (1) his exclusive reliance on Endless River's profit projection at the company's direction, without independently vetting the data; (2) his disregard of the Quote

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

Exchange's actual performance in favor of Endless River's artificial revenue projections; and (3) his failure to faithfully apply the venture capital approach when he increased the $18.9 million damages figure to $55.2 million using a step that he admitted was not specifically outlined in the methodology. The first two of these objections are well taken and sufficient to render inadmissible Dr. Malec's damages calculation without further consideration of the final objection.

The record shows that Dr. Malec based his calculations on fundamentally flawed information. First, recall that Dr. Malec used the revenues estimated in Endless River's profit projection as the foundational input for his calculations. In his rebuttal report, Dr. Malec states that he relied on this projection because it was "the only relevant projection that reasonably took into consideration the joint expectations of the [Quote Exchange] by both [Endless River] and [TransUnion]." (R. 192-1, PageID 10513, ¶ 20). Dr. Malec, however, did not independently verify the feasibility of these so called "joint expectations." Instead, he admitted during his August 18, 2022 deposition that he credited the profit projection simply because "Endless River believed [those estimations] to be true," based on conversations that he had with the company's principals about market opportunities available, (R. 218-1, PageID 11697, p. 538:20–21), and that he had "no reason to disagree" with those beliefs, (*Id*. at 11698, p. 542:6–7). This "wholesale adoption" of Endless River's profit projection without "apparently even evaluating the bases for those estimates" cannot stand because it merely "cloaks unexamined assumptions in the authority of expert analysis." *Ask Chems.*, 593 F. App'x at 510; *see also Nelson*, 243 F.3d at 252 (providing that "close judicial analysis of expert testimony is necessary 'because expert witnesses are not necessarily always unbiased scientists'" (quoting *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1352 (6th Cir. 1992))).

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

Second, Dr. Malec's reliance on the profit projection to the exclusion of the Quote Exchange's actual performance is troubling because of the stark gap between the profit projection's estimates and the Quote Exchange's real-world earnings. *See In re Onglyza (Saxagliptin) & Kombiglyze (Saxagliptin & Metformin) Prods. Liab. Litig.*, 93 F.4th 339, 345 (6th Cir. 2024) ("[F]ailure to adequately account for contrary evidence is not reliable or scientifically sound."). Endless River dismisses this gap, blaming developmental delays for the Quote Exchange's failure to reach its full financial potential. But Endless River's guesses about what *could have been* had the parties' partnership gone as it imagined only underscore the speculative character of the profit projection's estimates and further render Dr. Malec's conclusions based in part on this information unreliable for the purpose of measuring Endless River's contract damages. *See Tamraz*, 620 F.3d at 671 ("No matter how good [an] expert['s] credentials may be, they are not permitted to speculate." (citation omitted)). And, in any case, the question for the jury was not what the value of the Quote Exchange would have been had the partnership gone to plan. It was what the value of the Quote Exchange was as of April of 2018 if TransUnion had returned the source code when the partnership was terminated. Given that analytical framework, failure to take into account the progression of the partnership renders the valuation fundamentally unreliable. Here, we "conclude that there is simply too great an analytical gap between the data" and Dr. Malec's $55.9 million damages estimation because such estimation "is connected to existing data only by [Dr. Malec's] *ipse dixit*." *See Gen. Elec. Co.*, 522 U.S. at 146.

IV.

Given the defects infecting Dr. Malec's testimony, we are left with a definite and firm conviction that the district court made a clear error of judgment when it failed to exclude this evidence. Nevertheless, because the exclusion of Dr. Malec's testimony leaves Endless River with

Case Nos. 23-3087/3144, *Endless River Technologies, LLC v. TransUnion, LLC*

no evidence to prove damages, its breach-of-contract claim necessarily fails. We therefore AFFIRM the district court's vacatur of the jury's award on this basis.